John BEAUCHAMP, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 41A05–0110–CR–467.

Court of Appeals of Indiana.

May 21, 2003.

George Hoffman, III, Michael R. Auger, Jones, Hoffman & Admire, Franklin, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

This case might very well be illustrative of the old maxim, "penny wise and pound foolish," [1] with regard to whether an indigent defendant should be afforded public funds with which to retain an expert witness. Appellant-defendant John Beauchamp appeals his conviction for Battery Resulting In Serious Bodily Injury,[2] a class B felony, challenging the denial of his access to medical experts and the trial court's determination that several witnesses called by the State could testify. Beauchamp also urges that certain evidence was improperly admitted because the State had violated the trial court's

---

1. Robert Burton, *The Anatomy of Melancholy* (1621).

2. Ind.Code § 35–42–2–1(a)(4).

discovery order and challenges the propriety of his sentence.

## FACTS [3]

The facts most favorable to the verdict are that on August 6, 1998, eleven-month-old Chance Chilton was brought to the Methodist Hospital emergency room in Indianapolis with a skull fracture. Chance's mother, Suzanne Tolbert, as well as Beauchamp, her boyfriend, told the hospital physician that they were at home when they heard a thump in the baby's room followed by crying. While Tolbert's mother informed the doctor of her suspicion that the child had been abused, no report was made because Tolbert and Beauchamp's version of the events was consistent with the injuries that Chance sustained that day.

Thereafter, on September 6, 1998, Scott Alexander, an Emergency Medical Technician with the local fire department, was dispatched to Tolbert's residence following a report that an infant was not breathing. When Alexander arrived, he observed another paramedic rendering treatment to Chance.

Beauchamp initially told Alexander that the baby had just stopped breathing. However, Beauchamp then explained to other paramedics that Chance had hit his head on a desk in the bedroom. As various medical personnel attempted to stabilize Chance's head, Alexander felt the back of the baby's head and observed that it was soft and mushy. Chance was then placed on a backboard and transported to Wishard Hospital in Indianapolis.

When the police interviewed Beauchamp, he told them that he had picked Chance up from his crib and tripped over a beanbag chair. Beauchamp then indicated that he fell forward and Chance hit the back of his head on a desk. At one point, an officer with the Johnson County Sheriff's Department requested Beauchamp to demonstrate how the incident had occurred. Beauchamp indicated that when he fell, Chance's head was resting on his chest. Beauchamp then stated, however, that he had prevented Chance from hitting his head during the fall. Each time Beauchamp demonstrated to the officer how the incident occurred, his version of the events differed.

After Chance arrived at Wishard Hospital, a CT scan was performed. The test revealed fractures to the skull and Chance's brain density appeared abnormal and unusually dark. It was also discovered that Chance had a subdural hematoma over the surface of the brain near the top of his skull and his brain was swollen. Moreover, it was discovered that Chance had sustained a number of spinal injuries.

Chance eventually underwent surgery to have a blood clot removed and pressure relieved from the skull. However, Chance died from his injuries and an autopsy was performed. Blood was found inside Chance's eyes and both optic nerves were swollen. The results of the autopsy revealed that Chance died from blunt force injuries that had been inflicted upon his head and spine. The injuries were determined to be severe enough to cause brain swelling and brain death. It was ultimately concluded that the force necessary to cause such injuries was greater than a two-story fall and could have resulted from slamming Chance into a wall. Thus,

**3.** This court heard oral argument at Indianapolis on April 17, 2003 in the Indiana Supreme Court chambers. We were joined by a number of Carmel High School students and a group of international students from the Indiana University School of Law—Indianapolis. We appreciate counsel for their able presentations in the presence of so many who were witnessing our appellate process for the first time.

Chance could not have been injured in this fashion by falling out of a crib. Additionally, the physician who performed the autopsy determined that those types of injuries could not have been sustained if Chance had fallen to the floor in Beauchamp's arms. In light of these findings, child abuse was implicated and the cause of Chance's death was ruled a homicide.

Beauchamp was arrested on September 21, 1998, and charged with battery as a class B felony, involuntary manslaughter as a class C felony, and reckless homicide as a class C felony. Prior to trial, Beauchamp filed a number of motions with the trial court requesting public funds that would enable him to retain expert witnesses to testify on his behalf. While Beauchamp had initially retained private counsel to represent him in this case from the time that the charges had been filed and members of his family had paid nearly $12,000 in legal fees,[4] as of November 23, 1999, Appellant's App. p. 234, his appellate counsel at oral argument before this court acknowledged that his trial lawyers ultimately undertook pro bono representation of Beauchamp.

In each of the motions requesting expert witness fees, Beauchamp maintained that he was indigent and argued that such funds were necessary because the evidence to be adduced at trial was complex and pointed out that the State had identified thirteen physicians that it intended to call at trial. Beauchamp alleged that the case called for extensive review and analysis of medical records, literature and concepts that were far beyond the purview of legal counsel. Thus, he argued that expert assistance was required and would be used

for the purpose of advising defense counsel of the evidence that would be offered by the State and to aid in the preparation of appropriate cross-examination in specialized areas of medicine. In each instance, although the trial court determined that Beauchamp was indigent, it concluded that he failed to show that such experts were necessary. The trial court entered an order on October 14, 1999, denying three of Beauchamp's requests for expert witness funds. However, the trial court also noted that it had approved an appropriation of $3500 on December 19, 2000, to be paid to Beauchamp's counsel representing the costs incurred in taking the depositions of six witnesses. After that date, Beauchamp obtained a loan from family members in the amount of $7500 that was "primarily used to engage the services of an expert witness, Dr. Jan Leestma." Appellant's App. p. 438. After filing yet another request for funds, the trial court denied that motion on June 18, 2001. It found that Beauchamp's family had expended a total of approximately $25,000 for his defense. Appellant's App. p. 438. Notwithstanding such findings, the judge approved an allowance of $1500 to Beauchamp for the "purpose of utilizing an expert in framing questions to [one of the physicians]" in that same June 18 order. Appellant's App. p. 441. In all other respects, his requests for funding were denied.

At some point during the trial that commenced on July 17, 2001, the court allowed Dr. Mary Edwards–Brown to testify for the State during its case-in-chief. It was revealed that Beauchamp had retained Dr. Edwards–Brown and consulted with her at some point during the discovery process regarding various defense strategies and

---

4. Beauchamp indicated in a "Statement of Income, Expenses and Assets" filed with the court on June 19, 2000, that he was a self-employed subcontractor with a weekly take-home pay in the amount of $350. Appellant's App. p. 271. His total monthly expenses amounted to $1371, and the only asset he listed was under the category of "vehicles," which was a 1987 Ford F150, valued at $50. Appellant's App. p. 272.

theories that he might present at trial. Beauchamp's counsel subsequently decided not to identify her on the witness list, but she was listed by the State in spite of her prior consultation with Beauchamp's counsel regarding the merits of the case.

Also during the trial, the court permitted Dr. Thomas Luerssen to testify as a rebuttal witness for the State. The trial court had issued a pretrial discovery order essentially requiring both parties to disclose the names and addresses of expert witnesses, as well as reports or summaries of their expected testimony. At some point prior to trial, Beauchamp's counsel had deposed Dr. Luerssen regarding the injuries that Chance had sustained. Dr. Luerssen essentially formed no opinion as to how Chance was injured. It was Beauchamp's theory of defense that Chance's death was the result of the injuries he sustained in August, in addition to those that occurred on September 6. Thereafter, during rebuttal testimony that Dr. Luerssen presented at trial, he offered opinions that were new and substantially different from those he had provided in the deposition. Specifically, Dr. Luerssen was of the opinion that Chance's injuries could not have been caused by a fall from a crib and that they had likely been intentionally inflicted. Even though the State had listed Dr. Luerssen as a potential witnesses, it had not provided any reports or summaries of his expected testimony to Beauchamp's counsel that differed from the deposition testimony.

The State also attempted to introduce certain photographs of Chance at trial that had not been supplied to Beauchamp's counsel until the fifth day of the trial—a clear violation of the discovery order. Those photographs showed Chance playing on a slide and swinging on park equipment at a family gathering just prior to the fatal injuries. Even though the trial court initially excluded some of the photos from evidence because of the State's discovery violation, it later reasoned that the pictures could be offered because one of Beauchamp's defense witnesses, Jessica Miller, had "opened the door" when she testified in narrative form that they had put Chance "on swings and took pictures and everything." Tr. p. 2239–40.

Beauchamp's jury trial concluded on July 26, 2001, and he was convicted on the battery charge. Thereafter, Beauchamp was sentenced to a twenty-year term of imprisonment and he now appeals.

Because we reverse on the issue regarding the admission of the rebuttal testimony that was offered by the State, inasmuch as it failed to disclose the substance of the testimony prior to trial, the propriety of Beauchamp's sentence need not be addressed. However, we choose to discuss the remaining issues that Beauchamp raises, given the likelihood that those questions might again surface in the event of a retrial.

## DISCUSSION AND DECISION

### I. Indigency—Hiring Expert Witness

Beauchamp first contends that the trial court erred in requiring him to show, in open court, his need for expert funds as well as demonstrating how he intended to use those experts. Specifically, Beauchamp argues that such a requirement violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Privileges and Immunities Clause under Article I, Section 23 of the Indiana Constitution because such a directive places an indigent defendant in a position not otherwise occupied by those defendants who are not indigent. Thus, Beauchamp maintains that the hearings the trial court conducted regarding his need for the experts amounted to invid-

ious discrimination based solely upon economic status and bears no reasonable or substantial relationship to the class indigents who are accused of committing criminal offenses.

## A. Federal Claim

■ In addressing Beauchamp's federal claim that the equal protection clause has been violated, we first note that the guarantee of equal protection is a right to be free from invidious discrimination in statutory classifications or other governmental activity. *Harris v. McRae*, 448 U.S. 297, 322, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Social and economic legislation that neither impinges on fundamental rights nor employs suspect classifications must be upheld against constitutional attack when legislative means are rationally related to a legitimate governmental purpose. *Gary Comty. Mental Health Ctr., Inc. v. Ind. Dep't of Pub. Welfare*, 507 N.E.2d 1019, 1023 (Ind.Ct.App.1987). A challenged classification will be upheld if there is a rational relationship between the disparity of treatment and some legitimate government purpose. *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). To show that certain legislation is irrational, an appellant is required to negate every conceivable basis that might support it, whether or not the basis has a foundation in the record. *Id.* at 320–21, 113 S.Ct. 2637.

Additionally, when confronting an equal protection challenge, this court must first determine which level of scrutiny applies: the traditional "rational basis" analysis or the more stringent "strict scrutiny" test. In general, the strict scrutiny analysis applies only if the classification "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307,

312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). We have previously recognized that indigency is not a suspect classification that would justify strict judicial scrutiny. *Gary Cmty. Mental Health Center*, 507 N.E.2d at 1023.

Turning to the circumstances here, our supreme court has determined that a defendant is first required to show that he is indigent and secondly, that he show a "need" for the expert in open court before public funds will be allotted to him. *Scott v. State*, 593 N.E.2d 198, 200 (Ind.1992). The defendant must then show that an expert's services are necessary to assure an adequate defense and he must specify precisely how the requested expert services would benefit him. *Id.* The trial court then makes a determination as to whether the expert is necessary to assure an adequate defense.

Here, Beauchamp complains that requiring an indigent defendant to "reveal defense theories, trial strategies, investigations, and possibly inculpatory evidence in an open hearing subject to prosecutorial cross-examination and objection before a trial court will grant funds for expert assistance," Appellant's Br. p. 8, amounts to discrimination that is based solely upon economic status and bears no reasonable or substantial relationship to inherent characteristics of the class of those indigents who are accused of committing crimes. Therefore, Beauchamp points out that it is only the indigent defendants who must reveal confidential trial strategy and possible theories of defense to the court and the prosecution.

The rational basis here justifying the requirements in *Scott* is rooted in the State's compelling interest in ensuring that public funds are not spent needlessly, wastefully or extravagantly. An indigent defendant is required to show a need for the funds that he seeks and, through this

procedure, the trial court can become assured that it is not required to spend limited public funds in a useless or foolish fashion and that there is a legitimate purpose for the expert. *Scott,* 593 N.E.2d at 200. *Id.* A rational basis therefore exists requiring an indigent criminal defendant to meet additional showings for expert witnesses that is not required of those defendants who are able to afford their own witnesses.

### B. State Claim

■ In a related argument, Beauchamp contends that the requirements set forth in *Scott* violate the Privileges and Immunities Clause under our State Constitution. In essence, Beauchamp urges that the disparate treatment between indigent defendants and those who can afford their own experts is arbitrary and capricious and, therefore, must be declared unconstitutional.

Article I, § 23 of the Indiana Constitution provides that "the general assembly shall not grant to any citizen or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." The purpose of the equal privileges and immunities clause is to prevent the distribution of extraordinary benefits or burdens to any group. *State v. Price,* 724 N.E.2d 670, 675 (Ind.Ct. App.2000), *trans. denied.*

There are two considerations as to whether unequal privileges or immunities to differing classes should apply and be declared a violation of the Indiana Constitution. First, the disparate treatment accorded by the legislation must be reasonably related to the inherent characteristics that distinguish the unequally treated classes. *Collins v. Day,* 644 N.E.2d 72, 80 (Ind.1994). Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. *Id.* We will exercise substantial deference to legislative discretion and the challenger carries the burden to negate "every reasonable basis for the classification." *Teer v. State,* 738 N.E.2d 283, 288 (Ind.Ct.App.2000).

With respect to the first component, our supreme court in *Collins* determined that the basis for the classification must inhere in the subject matter. 644 N.E.2d at 78. That is, where the legislature has singled out one class of persons to receive a privilege or immunity not equally provided to others, such a classification must be based upon distinctive, inherent characteristics that rationally distinguish the unequally treated class, and the disparate treatment accorded by the legislature must be reasonably related to such distinguishing characteristics. *Id.* at 78–79.

The second prong required for a statute to pass muster under our constitution is that the disparate treatment must be applied equally and evenly to all those within the classification. As the *Collins* court observed, "any privileged classification must be open to any and all persons who share the inherent characteristics which distinguish and justify the classification, with the special treatment accorded to any particular classification extended equally to all such persons." *Id.* at 79. Legislative classification becomes a judicial question only where the lines drawn appear arbitrary or manifestly unreasonable. So long as the classification is based upon substantial distinctions with reference to the subject matter, we will not substitute our judgment for that of the legislature; nor will we inquire into the legislative motives prompting such classification. *Id.* at 80.

Here, the requirements set forth in *Scott* apply to any defendant who seeks public funds to hire an expert witness. Put another way, the *Scott* provisions that

require a defendant to show indigency as well as "need" and how the witness will benefit him, do not create or grant unequal privileges or immunities to differing classes of people. The fact that an individual who does not need public funds to hire an expert witness is not required to meet the same requirements does not automatically establish unequally treated classes. The requirements uniformly apply and funds are equally available to all individuals who are similarly situated. That is, any indigent defendant who comes before the court seeking public funds to hire an expert witness must satisfy the same requirements. Moreover, it cannot be said that Beauchamp has negated every reasonable basis for the classification. To the contrary, the rational and legitimate purpose of protecting the public treasury exists here. Therefore, Beauchamp has also failed to demonstrate that there was a violation of the Privileges and Immunities Clause under the Indiana Constitution.

## II. Denial of Funds To Hire Expert Witnesses

■ Beauchamp also argues that his conviction must be reversed because the trial court erred in denying his motion for funds to hire expert witnesses that were necessary for trial. Specifically, Beauchamp maintains that the trial court abused its discretion in denying his requests because he demonstrated indigence and a need for expert witnesses. Moreover, Beauchamp urges that he adequately demonstrated how he would use such expert assistance at trial.

■ In addressing this claim, we note that the appointment of experts for indigent defendants is left to the trial court's sound discretion. *Jones v. State,* 524 N.E.2d 1284, 1286 (Ind.1988). *Jones* determined that it is within the trial court's discretion to determine whether the re-

quested service would be needless, wasteful or extravagant. *Id.* at 1350. The trial court is not required to appoint at public expense any expert that the defendant might find helpful. *See Graham v. State,* 441 N.E.2d 1348, 1350 (Ind.1982). Additionally, the defendant requesting the appointment of an expert bears the burden of demonstrating the need for the appointment. *Kennedy v. State,* 578 N.E.2d 633, 639 (Ind.1991). The State also notes that the central inquiry in deciding the issue at bar are whether the services are necessary to ensure an adequate defense, *Himes v. State,* 273 Ind. 416, 403 N.E.2d 1377, 1379 (1980), and whether the defendant specifies precisely how he would benefit from the requested expert services. *Davidson v. State,* 558 N.E.2d 1077, 1084 (Ind.1990). In other words, a defendant cannot simply make a blanket statement that he needs an expert absent some specific showing of the benefits that the expert would provide. *See Scott,* 593 N.E.2d at 200. In addition to the requirements set forth in *Scott,* there are other guidelines that a trial court should follow when public funds are sought for expert assistance:

> Issues which the trial court should consider in determining whether a defendant is entitled to funds for an expert include (1) whether defense counsel already possesses the skills to cross-examine the expert adequately or could prepare to do so by studying published writings, (2) whether the purpose of the expert is exploratory only, *Hough v. State,* (1990), Ind., 560 N.E.2d 511, 516; and (3) whether the nature of the expert testimony involves precise physical measurements and chemical testing, the results of which were not subject to dispute. *Schultz v. State,* (1986), Ind., 497 N.E.2d 531, 533–34.

*Harrison v. State,* 644 N.E.2d 1243, 1253 (Ind.1995).

In this case, Beauchamp cites the trial court's order of October 14, 1999, which provided that "[t]he Defendant's current financial position, as shown by the evidence on the record before this Court, indicates that he is unable to fully fund expert assistance in his defense, should the same be deemed necessary." Appellant's App. p. 155. Similarly, the trial court's order of December 19, 2000, concluded that Beauchamp was indigent for the purpose of obtaining financial assistance in taking depositions of the physicians listed by the State as witnesses. Appellant's App. p. 295.

Beauchamp then notes that in his first three motions for funds to hire expert witnesses, assistance was necessary because he was charged with a class B felony, that the case involved the death of a child, that the evidence to be adduced at trial was going to be complex and the State had listed numerous medical professionals on its witness list. Appellant's App. p. 98, 131, 134. In light of the complexities of the case, Beauchamp requested the assistance of a forensic pathologist, ophthalmologist, and a pediatric neurologist or neurosurgeon. Appellant's App. p. 98, 131, 134. After a hearing on those motions, the trial court denied Beauchamp's request, determining that he failed to show that his counsel would be unable to adequately cross-examine the State's witnesses without the assistance of experts. Beauchamp filed a fourth motion on May 22, 2000, where he noted that the State had identified thirteen physicians as anticipated witnesses. Appellant's App. p. 419. Therefore, Beauchamp asserted in his request for funds that: (1) the case called for the extensive review and analysis of medical records, literature and concepts far beyond the purview of lawyers; (2) the charges are serious; and that (3) the issues of timing, causation, and mechanism/feasibility of injury are seminal and

all hinge largely on medical testimony. Appellant's App. p. 419–20. He went on to precisely state that expert assistance would be used for the purpose of advising defense counsel regarding evidence and opinions of the State's witnesses, to aid defense counsel in investigating the matter and to assist him in preparing appropriate cross-examination in specialized areas of medicine. Appellant's App. p. 420. Notwithstanding these assertions, the trial court again denied Beauchamp's request, ruling that "medical testimony will be significant in this case, although the Defendant makes no assertions that he otherwise experienced difficulty with the subject matter in taking the depositions of the State's expert witnesses." Appellant's App. p. 437.

Beauchamp contends that because the State's case hinged only upon the inferences that could be drawn from the testimony of six medical doctors with various specialties, the assistance of qualified experts was required to review the records and testimony, to aid in cross examination and to testify to the medical evidence. Thus, Beauchamp maintains that it was unjust, unfair and unrealistic to require his legal counsel to learn the specialties of various areas of medicine in order to present an adequate and effective defense. Appellant's Br. p. 24. In short, Beauchamp urges that because his counsel sufficiently demonstrated his need for expert assistance and indicated the type of assistance that was needed as well as how defense counsel expected to use those experts, his requests for funding should have been granted.

We must reject the State's contention that Beauchamp failed to establish even "a threshold showing of need" for expert witnesses. Appellee's Br. p. 15. In our view, it is apparent that Beauchamp successfully satisfied the requirement of showing legiti-

mate need for the experts and how they might inure to his benefit, thereby satisfying the requirements of *Scott.* Beauchamp pointed out in his first motion that "defense counsel is not knowledgeable in the field of medicine or the sub-specialty of forensic pathology and he is unable to adequately prepare and present a defense." Appellant's App. p. 98. Beauchamp then made a similar contention in the second request for funds in the context of ophthalmology and again in the third motion as to the field of pediatric neurology and neurosurgery. Appellant's App. p. 131, 134. Finally, in his fourth motion, Beauchamp urged that the "proper presentation of the Defendant in this case calls for extensive review and analysis of medical records, literature and concepts that are far beyond the purview of lawyers." Appellant's App. p. 134.

By the same token, it is apparent from our review of the record that Beauchamp indeed established the necessity requirements of *Scott* for an outlay of expert witness funds at an earlier juncture as determined by the trial court—one month later. The trial judge likely realized this and, in our view, Beauchamp was called upon to jump an insurmountable hurdle with respect to his request for expert witnesses. That is, defense counsel was asked to prove a need for those witnesses in light of his own lack of expertise. Naturally, such a burden cannot and should not have to be met. Although Beauchamp may have been ultimately awarded access to a medical advisor by approving $1500 in public funds shortly before the trial commenced, he was not afforded the benefit of his own expert witness, despite the showing he made under *Scott.* Again, while the trial court determined that Beauchamp was able to pay for part of his defense, the record shows that he could not pay for most of the costs including those charged by the experts as well as attorney's fees in light of his indigency.

We certainly recognize and appreciate a trial court's desire and duty to protect the public treasury. However, in circumstances such as the ones presented here today, it is certainly possible to be "penny wise and pound foolish"—given the tremendous expense of taxpayer dollars in bringing this cause to trial. Thus, we would urge the trial court to reconsider its ruling with regard to this issue in the event of a retrial.

### III. Testimony of Dr. Edwards–Brown

■ Beauchamp next asserts that the trial court erred in permitting Dr. Mary Edwards–Brown to testify at trial during the State's case-in-chief because she had previously been retained and consulted by Beauchamp's counsel. Inasmuch as Dr. Edwards–Brown was permitted to testify for the State after she was contacted, consulted and retained by Beauchamp's counsel, he claims that the cause must be reversed because the provisions of Indiana Trial Rule 26 were violated.

T.R. 26(B)(4)(b) provides that:

A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in Rule 35(B) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

In support of his argument, Beauchamp points to *R.R. Donnelley & Sons Co. v. North Texas Steel Co., Inc.,* 752 N.E.2d 112 (Ind.Ct.App.2001), *trans. denied,* where this court was confronted with the issue of whether an individual who was

retained as a consulting expert witness could be called to testify at trial by the opposing party. In *R.R. Donnelley*, the plaintiff filed suit against a number of defendants after several steel storage racks collapsed in its warehouse. As a result of the incident, R.R. Donnelley sued North Texas Steel (North Texas), the manufacturer of the component parts of the storage racks, Associated Material Handling Industries, Inc. (Associated), the party who purchased the racks from Frazier Industrial Company, the designer of the racks. North Texas received raw steel from the mill and constructed the racks according to the plan that Frazier had designed. The racks were then sent to R.R. Donnelley and were built under Associated's supervision.

Prior to trial, Associated hired an expert witness, Raymond Tide, to review the case and provide consultative services with respect to Associated's liability in the case. Associated and Frazier eventually settled their differences with R.R. Donnelley, leaving only North Texas at trial. Prior to settlement, however, Associated supplied a copy of Tide's opinion to R.R. Donnelley, North Texas and Frazier.

When the trial commenced, North Texas called Tide to testify as to his opinions concerning the cause of the rack's collapse. Tide testified that the welds were not the primary cause of the collapse and contradicted the testimony of R.R. Donnelley's expert, Kenneth Wood. R.R. Donnelley objected to the admission of this testimony based upon an affidavit of Associated's counsel, which averred that Tide had been hired as a consultative expert for the purpose of reviewing file materials, to render an opinion regarding the collapse of the

racks, and to discuss the merits of the claims.

On appeal, we determined that Tide's testimony should have been excluded on two different grounds. On one basis, relevant to this appeal, we determined that the trial court violated T.R. 26(B)(4)(b) by admitting Tide's testimony at trial because Tide was a consulting expert who had been retained by Associated in preparation for trial.[5] We noted that the discovery of a consulting expert in this State is not permitted absent "a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." *Id.* at 131. Therefore, we determined that permitting Tide to testify had the effect of subverting the very purpose behind T.R. 26.

In this case, Beauchamp points out that a meeting took place on July 10, 2000, between Dr. Edwards–Brown and his defense counsel. Appellant's App. p. 402. During that forty-five minute consultation, the two discussed the medical records and films of Chance and how they related to Beauchamp's trial strategy. Hypothetical scenarios were also discussed that revealed certain defense strategies. Appellant's App. p. 402. Subsequent to the meeting, Dr. Edwards–Brown generated a bill, sent it to Beauchamp's counsel and payment was tendered for her services. Tr. p. 1403.

In light of these circumstances, Beauchamp points out that several other individuals in Dr. Edwards–Brown's office could have performed substantially the same services that she provided to the prosecution and points to her testimony acknowledging that another staff member in the office actually read the initial medi-

---

5. Inasmuch as Associated was no longer an adverse party when Tide was called by North Texas to testify, *R.R. Donnelley & Sons* may

be distinguished from the case at bar on this basis.

cal films of Chance. Tr. p. 1523. Dr. Edwards–Brown also testified that there was a person in Chicago who could have provided the same service. Tr. p. 1524. Therefore, Beauchamp urges that the provisions of T.R. 26(B)(4)(b) were violated because the State did not adequately demonstrate that the required "exceptional circumstances" existed whereby it was permitted to present the testimony of Dr. Mary Edwards–Brown.

Although the State maintains that the trial court had granted a motion in limine instructing Dr. Edwards–Brown not to reveal that she had consulted with Beauchamp's counsel or to refer to any statements or information she had received from defense counsel, the spirit behind preventing such a practice exercised by the State in these circumstances is to "reinforce each litigant's motivation to aggressively develop his own side of any given case by retaining and relying on his own expert." *Reeves v. Boyd & Sons, Inc.,* 654 N.E.2d 864, 875 (Ind.Ct.App. 1995), *trans. denied, quoting Brown v. Ringstad,* 142 F.R.D. 461, 465 (S.D.Iowa 1992). Even though Dr. Edwards–Brown acknowledged that she did not remember the substance of her conference with Beauchamp's counsel, Tr. p. 1402, there still remains a real risk of substantial prejudice resulting from the fact that various defense strategies had been disclosed and discussed. Thus, in the event of a retrial, we would caution the trial court to reconsider its ruling with respect to allowing this testimony. Permitting Dr. Edwards–Brown to testify under these circumstances may very well have violated the spirit and intent behind T.R. 26(B)(4)(b), inasmuch as a party should certainly be protected when obtaining expert advice he requires in order to properly evaluate and present his case without fear that every consultation will be discoverable. That is, one party should not be allowed to benefit from the effort and expense borne by the other party in preparing his case.

## IV. Rebuttal Testimony of Dr. Luerssen

■ Beauchamp next complains that the rebuttal testimony of Dr. Thomas Luerssen should not have been admitted because he proffered opinions at trial that were different from his pretrial deposition testimony that had not been supplied to Beauchamp in violation of T.R. 26 and the pretrial discovery order. Thus, Beauchamp contends that he was denied a fair trial because the State waited to call Dr. Luerssen as a rebuttal witness when the evidence showed it was aware of his newly formed opinions that had not been provided to him.

In addressing this contention, we note that the trial court typically enjoys broad discretion in ruling on violations of discovery and we will reverse only if the court has abused its discretion. *Palmer v. State,* 640 N.E.2d 415, 421 (Ind.Ct.App.1994). With respect to rebuttal witnesses, nondisclosure is excused when that witness was unknown and unanticipated. *Sloan v. State,* 654 N.E.2d 797, 804 (Ind.Ct.App. 1995), *trans. denied.*[6] Additionally, the purposes of a pretrial discovery order are to enhance the accuracy and efficiency of the fact-finding process and to prevent surprise by permitting the parties adequate time to prepare their cases. *Wiseheart v. State,* 491 N.E.2d 985, 990 (Ind. 1986). Exclusion of evidence as a discov-

---

**6.** This case was abrogated on other grounds in *Hicks v. State,* 690 N.E.2d 215 (Ind.1997). We note that in *McCullough v. Archbold Ladder Co.,* 605 N.E.2d 175, 179–80 (Ind.1993), our supreme court strongly condemned the concealment of known and anticipated rebuttal witnesses. As we observed in *Sloan,* "such condemnation implies that such concealment should rarely be found to be harmless error." *Sloan,* 654 N.E.2d at 804.

ery abuse sanction is proper where there is a showing that the State engaged in deliberate or otherwise reprehensible conduct that prohibits the defendant from receiving a fair trial. *Palmer*, 640 N.E.2d at 421.

In support of his argument that he is entitled to a reversal on this issue, Beauchamp first sets forth the following provisions of T.R. 26(E)(1):

A party is under a duty seasonably to supplement his response with respect to any question directly addressed to:

(a) the identity and location of persons having knowledge of discoverable matters, and

(b) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

Additionally, Beauchamp points to the trial court's standing discovery order to disclose:

(a) The names and last known addresses of persons whom the State may call as witnesses (including rebuttal or expert witnesses who can be reasonably anticipated), together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements and a list of memoranda reporting or summarizing their oral statements, and, if no statements were taken, a summary of their testimony.

Appellant's App. p. 32.

Here, Beauchamp notes that his trial counsel deposed Dr. Luerssen eleven months prior to trial with the anticipation that he would elicit certain opinions with respect to the injuries that Chance sustained. At that deposition, Dr. Luerssen testified that he was unable to form an opinion as to the relationship between the injuries Chance received in August and those that were sustained in September. Defense counsel also extended Dr. Luerssen the opportunity to offer any other information concerning Chance, to which he declared that he had not formed any additional opinions.

However, when Dr. Luerssen was called as a rebuttal witness by the State, he offered opinions that substantially differed from those he provided in his deposition. Dr. Luerssen acknowledged at trial that he had reviewed "some of the records in the case" and was "familiar with some of the things that happened in [the] case." Tr. p. 2430–31. On the other hand, Dr. Luerssen stated in his deposition that he had not had the opportunity to review any chart notes from the hospital and had no knowledge of "what level the skull fractures from the August confinement at Methodist [Hospital] were." Appellant's Supp.App. p. 6. Moreover, the State did not provide any subject matter or reports to Beauchamp prior to trial. Instead, Beauchamp was only provided with Dr. Luerssen's name and a vitae sheet. It was only during the rebuttal testimony offered by Dr. Luerssen that Beauchamp learned that he had formed new opinions regarding the case and that his opinion as to Chance's injuries would be elicited at trial.

In his testimony, Dr. Luerssen declared that Beauchamp's explanation for Chance's injuries, combined with a compression fracture of the spine was not compatible. Tr. p. 2445. Dr. Luerssen also could not agree with the proposition that all the injuries Chance suffered could have been caused by falling out of a crib onto a box. Tr. p. 2448–49, 2452. To the contrary, he stated that a child falling from a height of "say four feet" would not sustain the types of fractures that Chance had sustained. Tr. p. 2434. In the end, Dr. Luerssen was of the opinion that Chance's injuries were

characteristic of those that had been inflicted and he could not agree that "a fall on top of a child caused these injuries." Tr. p. 2452, 2457.

In reviewing this testimony, it is quite apparent here that Dr. Luerssen was a known and anticipated expert rebuttal witness by the State. Moreover, the State was certainly aware that Dr. Luerssen was prepared to offer such new opinions even though they had not been provided to Beauchamp. This conduct violated the trial court's standing discovery order. Moreover, the State's actions here were in violation of the requirement under T.R. 26(E)(1) that the parties supplement the substance of their expert's testimony in a timely fashion.

The State responds that Beauchamp "could have requested a continuance if he had been concerned about Dr. Luerssen's testimony," Appellee's Br. p. 19, and points to *Hill v. State*, 531 N.E.2d 1382 (Ind.1989) in support of this proposition. Although a continuance may be an appropriate remedy in some circumstances, our supreme court in *Hill* determined that it was not error to deny the defendant's motion for a continuance to gather evidence in order to rebut "surprise" testimony that had been offered at trial by an arresting officer. *Id.* at 1384. The *Hill* court reasoned that although the officer had given deposition testimony offering one version of the events and then later changed his testimony at trial offering yet another version, a continuance was not warranted because the defendant could have recross-examined the officer and could very well have impeached him. *Id.*

Here, the remedy of a continuance would likewise be futile because Beauchamp had already offered the testimony of Dr. Luerssen establishing that he had not formed any opinion with respect to Chance's injuries. Until the State had introduced the damaging rebuttal testimony, Beauchamp could continue presenting his defense that the injuries occurring to Chance in both August and September of 1998 had contributed to the death. Thereafter, this testimony that was not disclosed to Beauchamp substantially impeded the likelihood of proceeding with that defense. Therefore, we cannot perceive of any plausible way that Beauchamp might be able to extricate himself from this dilemma. We would also note that in the event that continuances could routinely be granted in circumstances such as these, a defendant would never be able to plan a defense strategy.

It is quite apparent to us that the State engaged in a bit of "rope-a-doping" here—a term commonly used in the sport of boxing. In such instances, one fighter pretends to be trapped against the ropes while his opponent wears himself out throwing punches. Here, the State lies in wait as Beauchamp offers his defense and then goes on the offensive with the undisclosed, damaging testimony of Dr. Luerssen. Given the prejudicial impact of the testimony as a result of the violation of the discovery order as well as the provisions of T.R. 26(E)(1), we are compelled to conclude that the trial court's decision to allow Dr. Luerssen to offer his new and undisclosed opinions as to how Chance was injured amounted to reversible error. Thus, Beauchamp is entitled to a new trial on this issue.

### V. *Admission of Photographs*

■ Although issue IV discussed above merits a reversal, we nevertheless address Beauchamp's argument that the trial court erred in permitting the State to offer certain photographs of Chance into evidence that were material to the defense but had not been provided to him until the fifth day of trial in the event that a similar issue

would surface in the event of a retrial. The crux of Beauchamp's claim is that the State's failure to disclose this evidence to him in a timely fashion was material enough to result in a denial of due process. Beauchamp points out that the State's failure to disclose the photographs in a timely fashion substantially impeded his defense that Chance had an evolving condition beginning with the August injury because the pictures were evidence that Chance appeared to be in good health just prior to the injuries that had caused his death.

Before proceeding to the merits of this argument, we note that the admission and exclusion of evidence is within the trial court's discretion and the ruling will be reversed on appeal only for an abuse of discretion. *Dunlap v. State*, 761 N.E.2d 837, 841 (Ind.2002). An abuse of discretion occurs if the court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Palmer v. State*, 704 N.E.2d 124, 127 (Ind.1999). In determining whether the State's failure to disclose evidence amounts to a violation of due process, we note that *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), discussed three considerations in instances where the State suppresses "Brady"[7] evidence that is favorable to an accused. For a due process violation to occur, the defendant must demonstrate that: (1) the evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence has been suppressed by the State, either willfully or inadvertently; and (3) the suppressed evidence was material. The evidence should be deemed "material" only if there is a reasonable probability that, had the evidence been disclosed

to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. *Farris v. State*, 732 N.E.2d 230, 233 (Ind. Ct.App.2000).

The photographs here depicted Chance playing on a slide and swinging on some playground equipment on the day that Beauchamp allegedly caused the injuries that resulted in Chance's death. Those photos were evidence that Chance was in fine health, contrary to the defense that Beauchamp had advanced at trial. The State's neglect in not supplying the photos in a timely fashion served to undermine Beauchamp's defense that Chance's health began to deteriorate in August and progressed into September, thus rendering him more susceptible to internal bleeding and spinal fractures. Tr. p. 1799–1800. To be sure, it is apparent that Beauchamp was attempting to convey to the jury that Chance was in a state of malaise and was physically ill at the September 6 party. The timing of Chance's injuries was crucial to Beauchamp's defense, Tr. p. 1793–94, and because those injuries were complex, the photographs were material and favorable to his defense.

While the State did not dispute that the photos were in their possession for quite some time, it argued that it did not realize that they were relevant. Tr. p. 2133. As we determined in *Turney v. State*, however, even the "inadvertent" suppression of evidence by the State may be error. 759 N.E.2d 671, 675 (Ind.Ct.App.2001), *trans. denied.* At trial, nearly every physician testified that the event causing the injury

---

7. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that suppression of evidence by the prosecution favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution).

most likely occurred within six to twenty-four hours prior to his admission to the emergency room at Wishard Hospital. Tr. p. 1571, 1580–81. Inasmuch as the photos had not been disclosed and provided to Beauchamp at an earlier time, his defense counsel was effectively prevented from cross-examining and impeaching the expert witnesses—he could not display or even refer to the photos at trial. In essence, Beauchamp's defense counsel was compelled to base his defense on the theory that Chance's injuries were gradual and evolving without the knowledge that the State possessed the photographs. As a result, we reject the State's argument that these photos were not material and find the State's contention that the photographs were "inadvertently suppressed" of no moment.

We note, however, that the State's failure to disclose the photographs in a timely fashion did not prejudice Beauchamp. As explained below in further detail in issue VI, Jessica Miller acknowledged that Chance was playful, having fun on a swingset and was out running around at the September party. Therefore, her testimony suggesting that Chance appeared to be in good health on the day he was admitted to the hospital served to render any error on the part of the State in failing to disclose the photographs harmless. *See Badelle v. State*, 754 N.E.2d 510, 538 (Ind.Ct. App.2001), *trans. denied* (recognizing that where proper evidence was admitted regarding the identification of the defendant, any error stemming from other identification evidence that could be regarded as improper was harmless error, as no prejudice resulted to the defendant).

### VI. Opening the Door For Admission of Photographs

■ In a related issue, Beauchamp urges that the trial court erred in deter-

mining that he had "opened the door" for the admission of a number of photographs that had previously been excluded. In particular, Beauchamp contends that Miller's statement that "we put [Chance] on swings and took pictures and everything," constituted an unintended and unanticipated response to one of defense counsel's questions. Appellant's Br. p. 39. Therefore, because there was no intent to place the photos at issue, Beauchamp maintains that the trial court erred in determining that the door had been opened for the admission of the photographs.

This court has determined that when a defendant interjects an issue in a trial, he opens the door to otherwise inadmissible evidence. *Tawdul v. State*, 720 N.E.2d 1211, 1217 (Ind.Ct.App.1999), *trans. denied*. However, evidence relied upon to open the door must leave the trier of fact with a false or misleading impression of the facts related. *Roth v. State*, 550 N.E.2d 104, 106 (Ind.Ct.App.1990), *trans. denied*.

Here, Beauchamp's counsel had not posed a question to Miller before she interjected that photos of Chance had been taken at the family party. Miller testified that when she first arrived at the family picnic, she observed some of the people cooking food and others taking a walk in the woods. Following Beauchamp's counsel's response of "okay," Tr. p. 2240, Miller immediately continued, stating that "at the beginning ... Chance wouldn't go to anyone else and then he eventually came to me before we put him on the swings and took pictures of him and everything." Tr. p. 2240.

We fail to see how defense counsel's statement of "okay" served to interject the photographs into issue as argued by the State. However, even though the trial court may have erroneously determined that Beauchamp opened the door with re-

spect to the admission of the photographs, that error was harmless in light of Miller's testimony that Chance appeared to be in good health and was energetic and playful at the party.

## CONCLUSION

In light of our disposition of the issues set forth above, we conclude that permitting Dr. Luerssen to testify as a rebuttal witness for the State amounted to reversible error. The record establishes that the opinions and substance of that testimony were known to the State before trial and had not been supplied to Beauchamp. Moreover, Dr. Luerssen's opinions differed remarkably from those he presented during his pretrial deposition testimony regarding Chance's injuries, thereby undermining Beauchamp's defense and resulting in substantial prejudice to him.

We also note that requiring Beauchamp to show, in open court, his need for expert witness funds as well as demonstrating how he intended to use those experts, is not a violation of the Equal Protection Clause under the Fourteenth Amendment or the Equal Privileges and Immunities Clause under the Indiana Constitution. However, the record demonstrates that Beauchamp satisfied the requirements of *Scott*, where he established a legitimate need for his own expert witnesses and how they might benefit his defense.

Additionally, we conclude that Dr. Edwards–Brown should not have been permitted to testify for the State because she had previously met with Beauchamp's counsel to discuss various theories and defense strategies that would be presented at trial. Also, Beauchamp established that the photographs of Chance playing at the family reunion were relevant and material to his defense, and the State's argument that they were "inadvertently suppressed" must fail. However, such error was harm-less, inasmuch as a defense witness acknowledged that Chance was playing and appeared to be healthy at the family party just prior to his admission at the hospital. Finally, while the evidence did not support the trial court's conclusion that a defense witness "opened the door" for the admission of photographs that had been previously excluded from the evidence, that ruling did not prejudice Beauchamp and was, therefore, harmless.

Reversed and remanded for a new trial.

SULLIVAN, J., and DARDEN, J., concur.