**Ronald L. SHANABARGER,**
**Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 41A05–0207–CR–327.

Court of Appeals of Indiana.

Oct. 27, 2003.

Transfer Denied Jan. 14, 2004.

William Van Der Pol, Jr., Martinsville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Andrew A. Kobe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Ronald L. Shanabarger appeals his conviction for Murder,[1] a felony. Specifically, Shanabarger contends that the trial court erred: (1) in failing to grant his motion for judgment on the evidence because the State did not prove the corpus delicti of the crime; (2) in allowing his former trial counsel to testify at trial; (3) in permitting a clergyman to testify for the State; (4) in failing to grant a mistrial when it was shown that the State failed to disclose certain exculpatory evidence in a timely fashion; and (4) in conducting an interview of a juror that purportedly occurred outside the presence of counsel. Concluding that none of the alleged errors Shanabarger presents amount to reversible error, we affirm.

### FACTS

On June 20, 1999, the Franklin Police Department responded to a call at Amy and Ronald Shanabarger's residence after Amy discovered that their seven-month-old son, Tyler, had died in his crib. Tyler's body was eventually transferred to the Indiana University Medical Center where an autopsy was performed the following day. The pathologist, Dr. Michael Clark, initially determined that Tyler's death was consistent with Sudden Infant Death Syndrome (SIDS).

Shortly after Tyler's funeral, however, Shanabarger admitted to Amy that he had killed the child by wrapping his head in plastic wrap and suffocating him. Shanabarger then went to the Johnson County

---

1. Ind.Code § 35–42–1–1.

Sheriff's Office and told several detectives that he had killed Tyler. Shanabarger explained that he killed the child as an act of revenge against Amy for refusing to return from a vacation to attend his father's funeral. On June 24, 1999, Shanabarger was formally charged with the murder. Shanabarger then gave two taped statements to the police admitting that he had killed Tyler.

Shanabarger also met with Reverend Mark Maynard, the police chaplain. Prior to their conversations, Reverend Maynard informed Shanabarger that any statements made to him would not be confidential and further stated that he would recount their conversation to the detectives. Notwithstanding such a warning, Shanabarger admitted to Reverend Maynard that he had killed Tyler by wrapping cellophane or plastic wrap around his head and suffocating him.

While Shanabarger was awaiting trial, his court-appointed counsel, Richard Tandy, arranged a visit between Shanabarger, his sister Benita and his brother-in-law, Larry Savage (the Savages). Tandy told Shanabarger that anything he told the Savages would not be considered privileged communication. Nonetheless, Shanabarger revealed to them that he killed Tyler. He also acknowledged that Amy was not involved and further stated that he waited until Tyler was old enough to roll over so it would appear as a SIDS death.

Shanabarger wrote a number of letters to Amy from prison admitting that he killed Tyler, and he again told his relatives that he had committed the crime as well as how he did it. In light of these confessions and statements, the police seized three pieces of cellophane wrap that were found in Shanabarger's yard. Those samples were compared with various creases and anomalies that were noted on photographs of Tyler. The State, however, did not disclose those test results to Shanabarger in accordance with the trial court's discovery order. To the contrary, the existence of the comparison was not provided to Shanabarger until after the State had presented its case-in-chief. After DNA tests had been performed on the materials, a pathologist concluded that the cause of Tyler's death was non-specific asphyxia and that the manner of death was undetermined.

At the trial, Tandy testified as to some of the statements that Shanabarger had made to his sister and brother-in-law during the jail visit, including the possibility that he would plead guilty to the murder so the State would forgo seeking the death penalty. At the conclusion of a nine-day jury trial on May 8, 2002, Shanabarger was found guilty as charged. He now appeals.

## DISCUSSION AND DECISION

### I. Confessions and Corpus Delicti

Shanabarger first argues that the trial court erred in denying his motion for judgment on the evidence. Specifically, he argues that the motion should have been granted because the State failed to show the corpus delicti of the crime absent his uncorroborated confession.

In resolving this issue, we note that our corpus delicti rule holds that a crime may not be proven based solely on a confession. *Malinski v. State*, 794 N.E.2d 1071, 1086 (Ind.2003). Rather, the State must provide independent evidence that the offense was committed. *Workman v. State*, 716 N.E.2d 445, 447 (Ind.1999). The purpose of such a requirement is to prevent the admission into evidence of a confession by a defendant to a crime that never occurred. *Regan v. State*, 590 N.E.2d 640, 643 (Ind.Ct.App.1992). Thus,

the admission of a confession requires some independent evidence of the crime, including evidence of the specific kind of injury and evidence that the injury was caused by criminal conduct. *Malinski,* 794 N.E.2d at 1086. However, this evidence need not prove that a crime was committed beyond a reasonable doubt, but merely "provide an inference that a crime was committed." *Workman,* 716 N.E.2d at 447–48 (quoting *Stevens v. State,* 691 N.E.2d 412, 425 (Ind.1997)). The State is also not required to prove the corpus delicti by independent evidence prior to the admission of a confession, provided the totality of independent evidence presented at trial establishes it. *McManus v. State,* 541 N.E.2d 538, 539–40 (Ind.1989). Finally, the inference of a crime may be established by circumstantial evidence. *Workman,* 716 N.E.2d at 448.

Here, the evidence showed that Shanabarger spent the evening alone with Tyler before his wife returned home from work and went to bed without checking on the baby. Although the pathologist was unable to determine whether the death occurred from natural or purposeful suffocation, it was not required that every possible explanation of Tyler's death was to be precluded under the circumstances. *See Stevens,* 691 N.E.2d at 425.

Additionally, the State proved at trial that Shanabarger had a $100,000 life insurance policy on Tyler. After the murder, Shanabarger talked about how he was going to spend the money. Such independent evidence that the State offered at trial surrounding Tyler's death, including the pathologist's report and the plastic wrap containing the DNA material that was consistent with Tyler's, sufficiently demonstrated that Tyler's death "was caused by criminal conduct" in accordance with the corpus delicti rule. *Malinski,* 794 N.E.2d at 1086. These circumstances are contrary to Shanabarger's claim that "there is no independent evidence ... that a crime was committed by anyone." Appellant's Br. p. 18. As a result, there was no violation of the corpus delicti rule and the trial court properly denied Shanabarger's motion for judgment on the evidence.

### II. Permitting Former Counsel to Testify

Shanabarger next contends that the trial court erred in permitting Tandy, the original pauper counsel who was appointed to represent him, to testify about the conversations that occurred between Shanabarger and his sister and brother-in-law. Specifically, he maintains that the testimony should not have been admitted because it violated the attorney-client privilege under the theory that Shanabarger's relatives were agents of Tandy. He also claims that the work product rule under Trial Rule 26 was violated as were Indiana Rules of Evidence 408 and 410.

In addressing this issue, we note that in accordance with our attorney-client privilege statute, Indiana Code section 34–46–3–1(1), confidential communications made to an attorney in the course of their professional business and advice given in such cases is protected. In construing this statute, our supreme court has determined that the burden rests with the person who asserts the privilege to show by a preponderance of the evidence: (1) the existence of an attorney/client relationship; and (2) that a confidential communication was involved. *Mayberry v. State,* 670 N.E.2d 1262, 1266 (Ind.1996). Inasmuch as the privilege prevents the disclosure of relevant information and impedes the quest for truth, the privilege should be narrowly construed. *Hueck v. State,* 590 N.E.2d 581, 584 (Ind.Ct.App.1992), *trans. denied.* Additionally, this court has held that communications made within the presence or

hearing of a disinterested third person are not protected by the privilege. *Corll v. Edward D. Jones & Co.*, 646 N.E.2d 721, 726 (Ind.Ct.App.1995).

■ Next, we observe that statements by an attorney's client to an attorney's agent are protected under the statute, so long as: (1) the communication involves the subject matter about which the attorney was consulted; and (2) the agent was retained by the attorney for the purposes of assisting the attorney in rendering legal advice to or conducting litigation on behalf of the client. *See Brown v. State*, 448 N.E.2d 10, 14 (Ind.1983) (holding that the defendant's statements to a polygraph examiner retained by the defendant's counsel were privileged).

■ Here, although Shanabarger claims that the Savages were Tandy's agents, he fails to explain how such a proposition was satisfied. For instance, the record shows that Tandy neither "hired" nor "retained" Larry or Benita. Tr. p. 1307. Tandy specifically told Shanabarger that anything he told Larry and Benita was not privileged during the meeting at the jail. Tr. p. 1347, 1406. The Savages testified that they merely met with Shanabarger in an effort to convince him to enter a guilty plea to the offense in order to avoid the death penalty. Tr. p. 1347, 1418. This falls short of rendering the Savages agents of Tandy. As a result, Shanabarger's claim must fail, and his statements to the Savages are not protected by the attorney-client privilege.

■ Similarly, Shanabarger's claim that the statements he made to the Savages are protected by the work product privilege in accordance with Trial Rule 26 must fail. In pertinent part, this rule provides that "a party may obtain discovery of *documents and tangible things* otherwise discoverable under subdivision (B)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party...." (Emphasis added). Such statements are not protected by the work product privilege. *See State ex rel. Crawford v. Superior Court of Lake County*, 549 N.E.2d 374, 375–76 (Ind.1990) (holding that the work product privilege does not protect substantially verbatim witness statements from pre-trial discovery).

■ Shanabarger goes on to argue that the statements made during his meeting with Tandy and the Savages were inadmissible under Indiana Evidence Rule 408—the rule that pertains to compromise and offers to compromise. We note that the commentary accompanying this rule provides that it "is not intended to apply to criminal proceedings." Evid. R. 408 Commentary. Additionally, Shanabarger had not been negotiating with the Savages. Thus, Shanabarger's argument fails with respect to this issue.

■ Finally, Shanabarger argues that the provisions of Indiana Evidence Rule 410 must necessarily exclude this evidence. In relevant part, this rule provides that:

> Evidence of a plea of guilty or admission of the charge which was later withdrawn, or a plea of nolo contendere, or of an offer so to plead to the crime charged or any other crime, or of statements made in connection with any of the foregoing withdrawn pleas or offers, is not admissible in any civil or criminal action, case or proceeding against the person who made the plea or offer.

In this case, when the conversation occurred between Shanabarger and the Savages, there were no "withdrawn pleas or offers." Rather, the conversation was in anticipation of the course of action to follow should the State file a death penalty request. Tr. p. 1302. The Savages had no authority in any plea negotiations and, at

best, the conversation only amounted to a discussion of future plea negotiations. Therefore, it was not error to refuse to exclude the statements under Indiana Evidence Rule 410.

### III. Testimony of Clergyman

Shanabarger next contends that his statements made to Reverend Maynard were confidential and therefore protected by the clergyman privilege. Thus, inasmuch as his statements were erroneously admitted into evidence, Shanabarger asserts that his conviction must be reversed.

The clergyman privilege statute, set forth in Indiana Code section 34–46–3–1(3), provides that:

> Except as otherwise provided by statute, the following persons shall not be required to testify regarding the following communications:
>
> . . .
>
> Clergymen, as to the following confessions, admissions, or confidential communications:
>
> > (A) Confessions or admissions made to a clergyman in the course of discipline enjoined by the clergyman's church.
> >
> > (B) A confidential communication made to a clergyman in the clergyman's professional character as a spiritual adviser or counselor.

Here, Reverend Maynard spoke with Shanabarger at his house the morning that Tyler was discovered and at the jail on the day that he confessed to the killing. Although Shanabarger objected to the admission of his statements made to Reverend Maynard at the house, he did not object to statements made at the jail. Thus, the issue is waived. See Mitchell v. State, 726 N.E.2d 1228, 1235 (Ind.2000).

Waiver notwithstanding, the statements were not confidential communications under the privilege statute because Reverend Maynard expressly told Shanabarger on both occasions that anything Shanabarger told him was not confidential. Moreover, he explained to Shanabarger that anything he said to him would be shared with the police. Tr. p. 903, 916. As a result, the trial court did not err in permitting Reverend Maynard to testify.

### IV. Exculpatory Evidence

Shanabarger next contends that the trial court erred in denying his request for a mistrial because the State failed to supply him with the results of tests that had been performed prior to trial. Specifically, Shanabarger argues that he was entitled to a mistrial because the State failed to timely disclose the existence and the results of a test performed on the plastic wrap that involved a comparison of the cellophane to small creases and anomalies that were noted on photographs of Tyler. Shanabarger urges that the "[l]ate disclosure of the existence of the test also prevented the Defendant from adequately considering the ramifications of this result and making use of the findings in cross-examination of witnesses previously called by the State." Appellant's Br. p. 30.

In resolving this issue, we first note that suppression of evidence by the State that is favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Carroll v. State, 740 N.E.2d 1225, 1229 (Ind.Ct.App. 2000), trans. denied (citing Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). To establish a Brady violation, the defendant must satisfy the following factors: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have

been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *Id.* Additionally, a *Brady* violation arises if the defendant, using reasonable diligence, could not have obtained the information. *See Denney v. State,* 695 N.E.2d 90, 95 (Ind.1998). Exculpatory evidence has been defined as that which clears or tends to clear a defendant from alleged guilt. *Samek v. State,* 688 N.E.2d 1286, 1288 (Ind.Ct.App.1997), *trans. denied.* We also observe that evidence will be considered material under *Brady* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Carroll,* 740 N.E.2d at 1229. Put another way, the defendant must show that the evidence at issue reasonably could be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Id.* at 1230.

In the instant case, Shanabarger maintains that the State's failure to disclose the results of the test it had conducted prior to trial in a timely fashion warranted a mistrial. The State pointed out during its argument to the trial court that the test consisted of enlarging a photograph of Tyler's face so the pathologists could ascertain visible marks or creases that were consistent with his head being wrapped in plastic. Tr. p. 1618–19. The tests showed that there were no such marks.

We in no way condone the State's "twelfth hour" disclosure of the test results, which amounted to a violation of the trial court's continuing discovery order. To be sure, we recently confronted a similar issue in *Beauchamp v. State,* where we determined that the trial court erred in permitting a State's witness to offer rebuttal testimony that contained opinions that had not been supplied to the defendant in a timely fashion. 788 N.E.2d 881 (Ind.Ct. App.2003). We observed that:

> [T]he State engaged in a bit of "rope-a-doping" here. . . . [I]t lies in wait as Beauchamp offers his defense and then goes on the offensive with the undisclosed, damaging testimony of Dr. Luerssen. Given the prejudicial impact of the testimony as a result of the violation of the discovery order as well as the provisions of T.R. 26(E)(1), we are compelled to conclude that the trial court's decision to allow Dr. Luerssen to offer his new and undisclosed opinions as to how Chance as injured amounted to reversible error.

*Id.* at 894.

■ However, unlike the situation in *Beauchamp,* where we determined that the physician's previously undisclosed testimony was so prejudicial as to constitute reversible error, it is apparent that the test on the plastic wrap and the comparison of it to photographs of Tyler were neither specific enough nor perhaps sophisticated enough to determine whether that piece of cellophane had been used to kill the child. Thus, we do not consider the performance of the test and the results of it so material as to be considered "exculpatory evidence" under *Brady.* In other words, the test conducted by the State does not tend to prove that Shanabarger did not commit the offense.

■ Finally, we fail to see how the existence of the test and those results truly would have assisted Shanabarger's defense. While he ultimately claimed that Tyler had succumbed to SIDS, Shanabarger told his lawyers, the detectives and his relatives on numerous occasions that he killed Tyler by suffocating him with cellophane. This evidence, along with the circumstances surrounding the crime, certainly discounted the importance of the cellophane comparison test and the results.

Therefore, Shanabarger was not prejudiced by the State's actions. We thus conclude that the trial court did not commit reversible error in denying Shanabarger's motion for a mistrial on this basis.

*V. Conducting Interview With Juror*

Finally, Shanabarger argues that he was prejudiced when a conversation allegedly occurred outside his counsel's presence between the trial judge and an unknown juror regarding his prior attempt to plead guilty. Specifically, Shanabarger argues that because the interview did not occur in his presence, he was denied the opportunity to request a mistrial or other protective measures.

Sometime during the trial, the following exchange occurred:

*Unknown Juror:* May I say something?

*Court:* Sure. What do you want to say?

*Unknown Juror:* When I was sitting in the jury room a person was talking about another jury they were on and it was a stabbing case.

*Court:* Yeah?

*Unknown Juror:* And somebody said they plead guilty before the court (inaudible) came in. And they said maybe that would happen here.

*Court:* You never know what is going to happen.

*Unknown Juror:* And I said and somebody else said 'well He's already plead it before.'

*Court:* Well, let's just clarify it. Let's do it now. I want nothing else said about it but just act the way you should and when I admonish the jury that is exactly what I mean. I don't have many words and I don't say much but when I do I want them to mean something. Got it?

*Unknown Juror:* Yes, sir.

*Court:* Anything else you want to say?

*Unknown Juror:* Just that I feel bad about it happening. I didn't have the right paperwork.

*Court:* Well, I understand that. Thank you. See you in the morning. Go that way.

Tr. p. 724–25.

■ We note that the appellant has the burden of establishing the record necessary to support his claim. *Hernandez v. State,* 761 N.E.2d 845, 852 (Ind.2002). The possibility that an exchange between the court and juror may have affected the ultimate result is simply too speculative for appellate review. *Id.*

■ Here, the record reflects, and Shanabarger acknowledges, that there is no clear indication as to who was present during this exchange, and what exactly occurred that alerted the trial judge to possible jury misconduct. In essence, Shanabarger is requesting that this court speculate as to who was present during this conversation and is further asking that we somehow reconstruct the precise context of the conversation. We decline such an invitation. Moreover, it is apparent that Shanabarger is relying upon a mere unsupported assertion that he was prejudiced by the exchange. Thus, he has failed to meet his burden and is not entitled to relief on this basis.

*CONCLUSION*

In light of our disposition of the issues set forth above, we conclude that the trial court properly denied Shanabarger's motion for judgment on the evidence and that there was no error in permitting his former counsel to testify at the trial. Additionally, we conclude that it was proper to allow Reverend Maynard to testify and that the State's failure to disclose the existence of the cellophane wrap/photograph test and its results did not amount to

reversible error. Finally, we conclude that Shanabarger failed to show any prejudice with respect to a conversation that occurred between the trial judge and one of the jurors.

Affirmed.

SHARPNACK, J., concurs.

BROOK, C.J., Concurs with issues II and III, Concurs in result as to issues I and IV.