**Stephanie DUNLAP, Defendant–Appellant,**

v.

**STATE of Indiana, Plaintiff–Appellee.**

**No. 49S00–0002–CR–104.**

Supreme Court of Indiana.

Jan. 29, 2002.

---

Terrance W. Richmond, Milan, Indiana, Attorney for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, Priscilla J. Fossum, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

DICKSON, Justice.

The defendant was convicted of murder[1] for the January 23, 1998, killing of Tamika Ballard in Indianapolis. The defendant appeals claiming insufficiency of the evidence, erroneous admission of an autopsy photograph, erroneous admission of evidence related to a gun that was not the murder weapon, and erroneous exclusion of a transcript of a witness's prior inconsistent statement. We affirm the trial court.

### Sufficiency of the Evidence

■ The defendant claims there was insufficient evidence to show that she knowingly killed. In reviewing a claim of insufficient evidence, we will affirm the conviction unless, considering only the evidence and reasonable inferences favorable to the judgment and neither reweighing the evidence nor judging the credibility of the witnesses, we conclude that no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind.2000); *Webster v. State*, 699 N.E.2d 266, 268 (Ind.1998); *Hodge v. State*, 688 N.E.2d 1246, 1247–48 (Ind.1997). "A person engages in conduct 'knowingly' if, when [s]he engages in the conduct, [s]he is aware of a high probability that [s]he is doing so." Ind.Code § 35–41–2–2(b). A knowing killing may be inferred from the use of a deadly weapon in a manner likely to cause death. *Hawkins v. State*, 748 N.E.2d 362, 363 (Ind.2001)("Evidence that [the defendant] pointed and fired a shotgun at [the victim] striking him in the neck and chest is sufficient to sustain the murder conviction."); *Cook v. State*, 675 N.E.2d 687, 692 (Ind.1996)("Firing three shots in the direction of the victim undoubtedly constitutes using a deadly weapon in a manner likely to cause death.").

The facts favorable to the judgment show that, at the time of the incident, the defendant, Stephanie Dunlap, was living with Terrell Cole, and that Tamika Ballard, pregnant by Cole, was living with Cole's mother, Tina Westbrook. On the day of the incident, the defendant came to the Westbrook home and engaged in an argument with Ballard. The defendant left and returned, armed with an assault rifle. She then fired the rifle once into the air outside the home. Westbrook and Ballard rushed to the front door to find the defendant in the front yard pointing the rifle toward them. Ballard stayed on the porch, and Westbrook jumped off the porch and went around behind the defendant and attempted to persuade her to leave. At some point after Westbrook reached the defendant, the defendant fired two or three shots toward the screen door

---

1. Ind.Code § 35–42–1–1.

where Ballard was standing. One of these bullets struck Ballard, eventually killing her.

The defendant contends that Westbrook grabbed her and spun her around "at which point the gun discharged two to three times, one of the bullets somehow, probably by ricochet, striking Ballard." Br. of Defendant–Appellant at 18. She argues that the discharge of the weapon was accidental, and that the evidence fails to establish that she "knowingly" killed Ballard.

On direct examination Westbrook's testimony included the following description of the incident:

Q. ... When you get out to where [the defendant] is, tell the jury what happens.

A. I get in the back of her and I ask her would she get in the van, don't shoot at my house and she had started shooting.

Q. How close are you to [the defendant] when this is happening?

A. I'm right behind her, up right in the back of her.

Q. And what direction is the gun pointed?

A. Towards the porch.

Q. Towards the porch?

A. Yes, toward the screen door where Tamika [Ballard] was standing at.

Q. Does she fire the gun?

A. Yes.

Q. About how many times do you think she fires the gun?

A. Approximately three times.

Q. What are you doing while she's firing the gun, Miss Westbrook?

A. I'm just standing back there. There wasn't nothing I could do.

Q. After she fires the gun, what happens?

A. She—After she fired the gun, Tamika ran in the house and she gets in the van and takes off. And I goes back in the house and Tamika said she had been—she had been shot.

Q. Did you actually have your hands on [the defendant] as she's firing the gun?

A. Before she started firing I was asking her, you know, trying to turn her around to go to her van, asking her, "Don't shoot," you know. "Don't shoot at my house. Don't shoot up there at the porch," you know. And when she started shooting, I kind-of backed away.

Q. You kind-of backed away?

A. Yes.

Q. Do you think your hands were on her when she actually fired the gun in the direction of the house?

A. I'm not sure.

Record at 245–47. On cross examination, her testimony included:

Q. Now, I think you told Mr. Pitzer, Miss Westbrook, that you're not sure if you were grabbing [the defendant] while she was shooting. Is that what you're telling us today?

A. Yes, I am. I don't—I don't—I don't know if I was holding her. All I know when I—when I said I was trying to turn her around to go to her van, then she got to shooting.

Record at 252–53.

From the evidence that, after an earlier argument with Ballard, the defendant returned to the Westbrook home armed with an assault rifle, and thereafter fired it two or three times at the screen door where Ballard was standing, a reasonable jury could have found beyond a reasonable doubt that the defendant knowingly killed Ballard.

## Photograph of Victim

■ The defendant contends that the trial court erred in admitting State's Exhibit 15, an autopsy photograph of the victim, because the photograph's prejudicial effect outweighed its probative value. The defendant argues that she stipulated to the victim's identity and cause of death, and that the photograph shows the victim in an altered condition. The challenged photograph portrays the face of the victim with tubes extending from the victim's mouth and nose.

■ The admission and exclusion of evidence falls within the sound discretion of the trial court, and is reviewed only for abuse of discretion. *Byers v. State*, 709 N.E.2d 1024, 1028 (Ind.1999); *Amburgey v. State*, 696 N.E.2d 44, 45 (Ind.1998). Relevant evidence, including photographs, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ind.Evidence Rule 403; *Byers*, 709 N.E.2d at 1028.

■ The defendant first argues that the photograph was not relevant to any issue at trial because there was no dispute about the identity of the victim or that a living person was killed. The autopsy report regarding Ballard and two autopsy photographs were admitted by stipulation of the parties. This occurred at the end of the State's case. Record at 438–40. But, at the point in the trial when Exhibit 15 was admitted, the State still had the burden of proving the identity of the alleged victim. Photographs of a victim's corpse in a homicide case are relevant to prove the identity of the victim.[2] *Butler v. State*, 647 N.E.2d 631, 633–34 (Ind.1995); *Hughes v. State*, 546 N.E.2d 1203, 1211 (Ind.1989); *Brown v. State*, 503 N.E.2d 405, 409 (Ind.1987). The photograph was relevant to show the identity of the victim. The relevance of the exhibit is only part of the inquiry, however. Rule 403 permits the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.

The defendant refers us to cases in which we have found the danger of prejudicial effect to be high in photographs where the body depicted has been altered in some way. *See, e.g., Turben v. State*, 726 N.E.2d 1245, 1247 (Ind.2000)(finding photograph showing gloved hands manipulating a bloody mass with a probe inadmissible); *Allen v. State*, 686 N.E.2d 760, 776 (Ind.1997)("[A]utopsy photographs are generally inadmissible if they show the body in an altered condition."); *Loy v. State*, 436 N.E.2d 1125, 1128 (Ind.1982); *Warrenburg v. State*, 260 Ind. 572, 574, 298 N.E.2d 434, 435 (1973)(finding it error to admit autopsy photograph which showed a partially resewn corpse, nude from the waist up, with the right arm of the corpse severed completely and the left arm reattached with gaping sutures); *Kiefer v. State*, 239 Ind. 103, 111–12, 153 N.E.2d 899, 904–05 (1958)(finding it reversible er-

---

**2.** As there were no wounds to the victim's face, the photograph in this case is not unlike using a photograph of a victim as they appeared shortly before death, which we have held to be admissible. *See Evans v. State*, 563 N.E.2d 1251, 1263–64 (Ind.1990), *reh'g granted in part*, 598 N.E.2d 516 (Ind.1992); *Minnick v. State*, 544 N.E.2d 471, 478 (Ind.1989)(finding pictures admissible for identification of victim by witnesses who had observed the victim's movements on day of murder); *Raub v. State*, 517 N.E.2d 80, 83 (Ind.1987); *Heald v. State*, 492 N.E.2d 671, 682–83 (Ind.1986), *overruled on other grounds by Spradlin v. State*, 569 N.E.2d 948 (Ind. 1991); *Shelton v. State*, 490 N.E.2d 738, 742–43 (Ind.1986)("perpetrators of such acts are not entitled to have their deeds completely sanitized when evidence is submitted to a jury"); *Averhart v. State*, 470 N.E.2d 666, 685 (Ind.1984)(finding picture of victim with granddaughter was relevant to show his appearance on day of murder and claim that photograph was unduly prejudicial waived).

ror to admit autopsy photographs showing hands and instruments of surgeon inside chest of victim).

■ Evaluation of whether the exhibit's probative value is substantially outweighed by the danger of unfair prejudice is a discretionary task best performed by the trial court. We are not persuaded that the court abused its discretion in admitting the exhibit.

## Similar Gun Evidence

■ The defendant contends that the trial court erred in allowing the State to show and demonstrate a 7.62 assault rifle[3] despite the fact that no weapon was found related to the victim's fatal gunshot wound. The State offered the rifle as a demonstrative exhibit during expert testimony from a tool marks and firearm examiner.

■ "Demonstrative evidence is evidence offered for purposes of illustration and clarification." *Wise v. State,* 719 N.E.2d 1192, 1196 (Ind.1999). Demonstrative evidence may be admissible if it sufficiently explains or illustrates relevant testimony as to be a potential help to the trier of fact. *Id.* The admissibility of demonstrative evidence must also meet the requirements of Rule 403, which balances probative value against prejudicial effect. *Id.* Trial courts are given wide latitude in

weighing probative value against the danger of unfair prejudice, and we review that determination for abuse of discretion. *Houston v. State,* 730 N.E.2d 1247, 1251 (Ind.2000).

Emphasizing that the murder weapon was not found and that the defendant claimed that the shooting was accidental, the State argues that this demonstrative evidence was important so that the jury could view a weapon similar to the one used in the killing and be told "about how such a weapon works in order to determine whether [the defendant] knowingly killed [the victim]." Br. of Appellee at 9. We agree that the exhibit has significant probative value on the issue of accident.

The potential danger that this exhibit could mislead the jury is low, particularly when considering that the court admonished the jury, "There was no weapon found in this case. The weapon that m[a]y be displayed is a demonstrative exhibit that is going to be used by the State to demonstrate or show you what a similar type weapon could or should look like." Record at 416. The probative value of the exhibit on the issue of accident is sufficient to support the trial court's decision to admit the evidence, especially in light of the admonishment given.[4] We decline to find that the trial court abused its discretion in admitting the evidence.[5]

---

3. Ballistics testimony at trial from David Brundage, a tool marks and firearm examiner for the Indianapolis Marion County Forensic Services Agency, concerning two spent shell casings and two bullet jacket fragments found at the murder scene revealed that the victim was shot by either an AK–47 or an SKS, the common names for a 7.62 assault rifle. Record at 412–414. Also, Westbrook's description of the gun the defendant was carrying as a rifle with a belt that went around the defendant's neck is consistent with an AK–47 or SKS. *Id.* at 239–40.

4. *See Berry v. State,* 715 N.E.2d 864, 867 (Ind.1999)(holding that the trial court was

within its discretion when it admitted similar shotgun as used in crime because although marginally relevant, prejudice also low given that the court had admonished the jury).

5. The defendant also challenges Brundage's "trigger pull" testimony as lacking foundation because "he had no gun used in the incident to examine or test." Br. of Defendant–Appellant at 13. At trial, the defendant lodged this objection when Brundage was asked, "[W]ould there be a trigger pull that you would associate with that type of weapon [referring to the semi-automatic assault rifle used by the prosecution for demonstrative purposes]?" Record at 421. After the defen-

## Prior Inconsistent Statement

█ The defendant contends that the trial court erred in excluding a transcription of a tape-recorded statement Westbrook gave to police. The defendant sought to admit a transcription of the statement into evidence as a prior inconsistent statement. The State objected to the exhibit on the grounds that the testimony at trial was not inconsistent with the previous statement. The defendant contends that the statement should have been admitted pursuant to Indiana Evidence Rule 613(b), which provides in relevant part:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. . . .

Evid. R. 613(b). The issue presented is whether the prior statement is inconsistent with the witness's trial testimony.[6]

dant's objection was overruled, Brundage testified that a weapon of the type being demonstrated "has somewhere between a five and seven pound or five and eight pound trigger pull." Record at 422. He then explained that among various types of guns, a trigger pull of less than one and one half pounds was considered "extremely light" such that barely touching the trigger "might set the trigger off," *id.* at 423; that a trigger pull of two and a half pounds is "very light" and the minimum allowable in pistol matches, *id.* at 422; and that a trigger pull above ten or eleven pounds is considered "quite heavy." *Id.* at 423. This testimony did not purport to be based on any test of the weapon used in the killing but only provided general trigger pull information regarding the type of weapon that would produce the shell casings and bullet jacket fragments found at the murder scene. The trial court did not err in overruling the defendant's objection asserting lack of foundation.

6. Comparing two statements by a witness to test for inconsistency is not an exact science. Given the varying nuances that arise in a person's account of historical events, the trial judge must be given wide discretion in determining whether two statements are sufficiently inconsistent. *See United States v. Higa*, 55 F.3d 448, 453 (9th Cir.1995)("The trial judge has a 'high degree of flexibility' in deciding how much inconsistency is enough to permit use of a prior statement for impeachment."); *United States v. McCrady*, 774 F.2d 868, 873 (8th Cir.1985)("The trial judge has considerable discretion in determining whether trial testimony is inconsistent with prior statements."); 1 McCORMICK ON EVIDENCE § 34 (John W. Strong ed., 5th ed. 1999)("[A] fair range of discretion must be accorded the trial judge."). Notwithstanding the inherent ambiguity of the inquiry, attempts have been made to put a definition on the exact degree of inconsistency required to meet the threshold for impeachment. *See, e.g., United States v. Winchenbach*, 197 F.3d 548, 558 (1st Cir.1999)("irreconcilably at odds"); *United States v. Cody*, 114 F.3d 772, 776–77 (8th Cir.1997); *United States v. Trzaska*, 111 F.3d 1019, 1024–25 (2d Cir.1997)(finding statements need not be diametrically opposed but at least do need to reveal variance that has reasonable bearing on credibility); *United States v. Gravely*, 840 F.2d 1156, 1163 (4th Cir.1988)("To be received as a prior inconsistent statement, the contradiction need not be in plain terms. It is enough if the 'proffered testimony, taken as a whole, either by what it says or by what it omits to say' affords some indication that the fact was different from the testimony of the witness whom it sought to contradict."); *Abdul–Wadood v. State*, 521 N.E.2d 1299, 1301 (Ind.1988)("[S]light discrepancy in the two statements by [the witness] is not of fundamental importance nor necessarily inconsistent.") *Sanger v. Bacon*, 180 Ind. 322, 328, 101 N.E. 1001, 1003 (1913)("[C]ontradiction must appear after the evidence is construed most favorably to the witness sought to be impeached."); *Myers v. Manlove*, 164 Ind. 128, 131, 71 N.E. 893, 894 (1904)("The contradiction need not be in terms, but the impeaching declaration must be inconsistent with the testimony of the witness in some material particular."); *Wagner v. State*, 116 Ind. 181, 184, 18 N.E. 833, 835 (1888)("If the two statements are consistent and reconcilable with each other, the statement made out of court will not be received

At trial Westbrook testified that she tried to turn the defendant around but was not sure whether she was holding on to or touching the defendant when the shots were fired. The defense then confronted her with excerpts from a transcription of her statement to the police when interviewed a year and a half earlier and cross-examined her regarding it. Westbrook acknowledged making the statement. The defense then read the following from the transcript and asked Westbrook if she remembered saying this to police:

Q. Where was [defendant], where was [defendant] standing when you saw her with the gun?

A. She was in the yard.

Q. Okay, front yard?

A. The front yard, so I try to run at there to make one like on the side where the gun when point to make—make her turn her around slowly to go into the van and she shoots it, then.

Q. Did she shoot before you got a hold of her?

A. One, the first one was.

Record at 257. Westbrook replied: "I don't remember saying this." *Id.* Then directing Westbrook's attention to a later part of her statement, the defendant's trial counsel asked whether it would be "fair to say ... that at least certainly the statements on page 15 where you told Detective Burks you grabbed her while [defendant] was shooting,[7] that's different from what you're telling us today, right?" *Id.* Westbrook answered, "Yes, because I don't exactly remember it from the time I made this statement." *Id.* Shortly thereafter, the defense offered as an exhibit the entire 18 page typewritten transcript into evidence for the purpose of impeachment as a prior inconsistent statement. The State objected, arguing that it was not inconsistent, and the trial court refused to admit

to impeach the witness."); *Seller v. Jenkins,* 97 Ind. 430, 1884 WL 5434 (1884)("material inconsistency" and "differs in material particular"); *Commonwealth v. Pickles,* 364 Mass. 395, 402, 305 N.E.2d 107, 111 (Mass. 1973)("[A] 'prior inconsistent statement' need not directly contradict the testimony of the witness. It is enough if its implications tend in different direction."); McCormick, *supra,* at § 34 ("The pretrial statement need 'only bend in a different direction' than the trial testimony." (quoting McNaught & Flannery, Massachusetts Evidence: A Courtroom Reference 13–5 (1988))); 4 Weinstein's Federal Evidence § 613.04[1] (Joseph M. McLaughlin ed., 2d ed. 2001)("Any statement is inconsistent if under any rational theory it might lead to any relevant conclusion different from any other relevant conclusion resulting from anything the witness said."); 3A Wigmore on Evidence § 1040(1) (James H. Chadbourn ed., rev. ed. 1970)("As a general principle, it is to be understood that this inconsistency is to be determined, not by individual words or phrases alone, but by the *whole impression or effect* of what has been said or done. On a comparison of the two utterances, are they in effect inconsistent? Do the two expressions appear to have been produced by inconsistent beliefs?"); William G. Hale, *Impeachment of Witnesses by Prior Inconsistent Statements,* 10 S.Cal. L.Rev. 135, 161 (1937)(suggesting need only find one inconsistent reasonable inference (out of two or more possible inferences)).

7. This question was apparently referring to the following colloquy:

Q. OK, and then what happened, did you actually get hold of [defendant], grabbed her?
A. Yeah, because—
Q. While she was shooting?
A. Yeah cause one of one of ah, I guess it was a shell, cause that what scared me, made leave her (unknown), pull away from her, is one of the shells had, when she shot had came back on me and it cut and (unknown) I didn't have no car and done touch my arm and I just moved on back, so then when she—

Record at 281 (page 15 of the interview transcript).

the exhibit. Record at 265. For the purposes of Rule 613(b), a statement at trial of "I am not sure" or "I don't remember" is not necessarily inconsistent with an earlier statement that provides the answer to the question being asked. We consider the differences between Westbrook's trial testimony and her statements in the transcribed police interview to be within the ambit of the trial court's discretion to determine inconsistency. We decline to find that the trial court erred in sustaining the State's objection asserting that the prior statements were not inconsistent.

## Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and BOEHM and RUCKER, JJ., concur.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Justice, dissenting.

I respectfully dissent. It seems to me that the testimony of Westbrook does not support a reasonable inference that the defendant was aware of a high probability that Tamika Ballard would be killed as a result of her conduct.

Even if I were to conclude that this evidence was sufficient to support such an inference, the inference would be so weak that at least one of what I perceive to be three trial court errors would require reversal. *See Fleener v. State*, 656 N.E.2d 1140, 1142 (Ind.1995) (trial court error assessed on basis of "its probable impact on the jury, in light of all of the evidence in the case"). I see no relevance, first, of the autopsy photograph or, second, the assault rifle demonstration. Because this evidence was admitted in violation of Indiana Evidence Rule 402 ("Evidence which is not

relevant is not admissible."), the trial court abused its discretion in allowing it.

Finally, I disagree with the majority that it was proper for a police officer to testify as to the "trigger pull" on the weapon the defendant fired. There was literally no foundation whatsoever for this testimony—the weapon was never found. Without any foundation, allowing this testimony was highly improper given that the defense here was accident and the officer's testimony on "trigger pull" was effectively an opinion on the likelihood of accident. Without the weapon, he did not have the requisite "facts or data" to give such an opinion. *See* Evid. R. 703.