**Arra RANSOM, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0507–CR–659.

Court of Appeals of Indiana.

July 13, 2006.

Ruth Johnson, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Scott L. Barnhart, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Arra Ransom appeals her convictions, after a jury trial, of confinement, as a class B felony, and battery, as a class C felony.

We affirm in part, reverse in part, and remand.

### ISSUES

1. Whether sufficient evidence supports the convictions.

2. Whether the trial court erred when it denied Ransom's motion for a new trial, which asserted that the State failed to disclose evidence favorable to the defense.

Whether her convictions for confinement and battery violate the double jeopardy provision of the Indiana Constitution.

### FACTS

In December of 2003, Michael Ransom ("Michael") lived at his Indianapolis home. His son, Halim Ransom ("Halim"), also lived in the home, along with Halim's girlfriend, Katie Cahill ("Cahill"), and three-year-old J., the son of Halim and Cahill. Ransom is Michael's daughter (and Halim's sister). Ransom and her boyfriend Michael Reeves lived in an apartment about five minutes away from Michael's house. Cahill and Ransom had been close friends for four to five years.

On December 13, 2004, Cahill and Ransom talked on the telephone several times. Ransom called Cahill during the afternoon from Chicago, where she was shopping. Later in the evening, Cahill talked to Ransom after returning to Indianapolis. Subsequently, a telephone conversation "around midnight" was "not ... real friendly," and "less than pleasant." (Tr. 53, 54). Ransom was "upset," and she accused Cahill of having been in Ransom and Reeves' apartment during their absence. Ransom told Cahill that a neighbor had reported Cahill's presence in the apartment, and she reminded Cahill that she and Reeves were missing a key to their apartment. Ransom hung up on Cahill, and when Cahill attempted several times to call her back, Ransom did not answer.

About fifteen minutes later, Ransom and Reeves arrived in front of Michael's home. Cahill had been alone in the living room, and when she saw them drive up, she went from the living room, through the dining room, to the kitchen for a cigarette. Ransom used her key to let herself and Reeves into the house. Cahill was walking back toward the living room, through the dining room, and observed Reeves walking toward her with something in his hand; Ransom was "behind him" at a distance of "a couple feet." (Tr. 89, 178). Both Reeves and Ransom began "yelling at [her] ... accusing [her] of taking money" and yelling "that [she] had the key" and, as they walked toward Cahill, yelling "to give them ... their key back." (Tr. 60). When Reeves walked closer, he "started hitting [Cahill] with the gun." *Id.* "[A]t one point," Ransom "told him that was enough, ... told [Reeves] that was enough and to stop." (Tr. 62). Reeves also placed the gun in Cahill's mouth and touched it to her face. Cahill fell to the floor, lost control of her bladder, and curled up with her hands over her head.

Hearing yelling, Michael came into the room and saw Cahill on the floor. Michael observed that Cahill's head was bleeding and she had a knot on her forehead, and that Reeves had a gun in his hand, "a real gun." (Tr. 207). Ransom and Reeves "were saying ... that [Cahill] had broken into their apartment and had been stealing from them." (Tr. 227). "[T]o get them on out of there," Michael told Ransom and Reeves that the police were on the way. (Tr. 203). Ransom and Reeves left the house. Michael, a retired firefighter, examined Cahill and concluded that she did not have a significant head injury, and he applied ice to her head.

Later during the day of December 14, 2003, Ransom called Cahill and asked whether she was going to press charges. Also on December 14th, police received an anonymous report that Cahill had been beaten. An officer went to Michael's home and took a report from Cahill; her forehead injuries were photographed.

On December 23, 2003, the State charged Ransom with having committed various offenses on December 14, 2003, including confinement as a class B felony; battery, as a class C felony; pointing a firearm, a class D felony; and carrying a handgun without a license, a class A misdemeanor. Ransom was tried before a jury on January 31 and February 1, 2005, during which the State argued that Ransom "aided in" the attack on Cahill, and "failed to oppose" or take action to stop the attack. (Tr. 384). Testimony as to the foregoing was heard. Pictures of Cahill's forehead injuries were also admitted into evidence. At the close of evidence, the trial court granted Ransom a directed verdict on the charge of carrying a handgun without a license. The jury found Ransom guilty of the other three charges, and the trial court entered judgment of the convictions.[1]

On March 22, 2005, Ransom filed a motion for a new trial. Ransom asserted that in violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the State had failed to disclose to her that on October 28, 2004, an arrest warrant for Cahill had been issued after she failed to appear for a pretrial conference on a charge of conversion filed October 17, 2004. The trial court held evidentiary hearings on March 23 and April 29, 2005. Cahill testified that shortly before

---

1. At sentencing, the trial court merged the pointing-a-firearm charge into the confine-ment charge.

trial, she had made a "general" inquiry of Detective Tiffany Woods regarding whether trial witnesses were checked for outstanding arrest warrants, and that Woods had informed her that as far as she knew, this was not done. (Tr. 439). Cahill further testified that she had never informed either Woods or the prosecutor before trial about her October 2004 arrest, or her failure to appear for the pretrial conference, or that there might be a warrant for her arrest. Woods testified that Cahill never informed her about any "warrant out for her arrest." (Tr. 470). Woods testified that Cahill's mother had called her shortly before trial and informed her that Cahill "had picked up a new case and was worried about whether she was going to be in trouble by [sic] the judge." *Id.* Woods told her, "I don't know," *id.*, and asked, "Does she have a warrant?" (Tr. 478). Cahill's "mom replied that she had no idea." *Id.* Woods also testified that she informed the prosecutor that Cahill's mother "had called ... and said [Cahill] picked up a new case." (Tr. 473). On May 25, 2003, the trial court issued a six-page order denying Ransom's motion for a new trial, finding no *Brady* violation because the existence of the arrest warrant (1) was "not favorable to" Ransom, (2) was "public record and not subject to suppression," and (3) "would not have changed the outcome of the trial." (App. 189, 190).

## DECISION

### 1. *Sufficiency of the Evidence*

When reviewing a claim of insufficient evidence, we will affirm the conviction unless, considering only the evidence and reasonable inferences favorable to the judgment and neither reweighing the evidence nor judging the credibility of the witnesses, we conclude that no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

*Dunlap v. State,* 761 N.E.2d 837, 839 (Ind. 2002).

■ The State argued that Ransom was liable for the offenses charged as an accomplice. Indiana law provides that a person "who knowing or intentionally aids, induces, or causes another person to commit an offense commits that offense...." Ind.Code § 35–41–2–4. To be convicted of a crime under the theory of accomplice liability, it is not necessary that the defendant participate in every element of that crime. *Bruno v. State,* 774 N.E.2d 880, 882 (Ind.2002). The defendant's "presence during the commission of the crime or the failure to oppose the crime are, by themselves, insufficient to establish accomplice liability"; however, "they may be considered along with other facts and circumstances tending to show participation." *Hodge v. State,* 688 N.E.2d 1246, 1248 (Ind.1997). Thus, in determining whether a person aided, or was an accomplice to, another in the commission of a crime, our Supreme Court

has long considered the following four factors: (1) presence at the scene of the crime; (2) companionship with another engaged in criminal activity; (3) failure to oppose the crime; and (4) a defendant's conduct before, during, and after the occurrence of the crime.

*Garland v. State,* 788 N.E.2d 425, 431 (Ind. 2003).

### a. *Battery.*

■ Ransom's first argument concerns the offense of battery. Battery is defined as the "knowing[ ] or intentional[ ] touching" of "another person in a rude, insolent or angry manner," and the offense is "a class C felony if it results in serious bodily injury to any other person or if it is committed by means of a deadly weapon."

I.C. § 35–42–2–1. We begin by considering Ransom's presence at Michael's house that night, and whether her presence tended to show participation. *Garland,* 788 N.E.2d at 431. It was Ransom who, in their last telephone conversation, accused Cahill of her unauthorized presence in the apartment of Ransom and Reeves. She hung up on Cahill and did not answer when Cahill attempted to call her back. Fifteen minutes later, Ransom and Reeves arrived at Cahill's residence. These facts support the inference that Ransom and Reeves went to her residence to physically confront Cahill. Further, Reeves' armed presence in Cahill's residence was facilitated by Ransom's use of her key to gain entry.

We next consider her companionship with Reeves during his assault of Cahill with the gun. *Garland,* 788 N.E.2d at 431. Ransom draws our attention to testimony by Cahill that Ransom was not in the room when Reeves first struck her with the gun. However, as reflected by the quoted testimony in FACTS, Cahill's testimony can also support the contrary inference. The jury, not the appellate court, assesses credibility and weighs evidence. *Becker v. State,* 585 N.E.2d 279, 281 (Ind.Ct.App.1992). Thus, it is for the trier of fact to resolve conflicts in the evidence. *Kilpatrick v. State,* 746 N.E.2d 52, 61 (Ind.2001). Moreover, the evidence established that Ransom was Reeves' companion both before and after the attack on Cahill, not simply during its occurrence, and that their companionship extended to having contemplated this physical confrontation before arriving at Cahill's residence. They were also companions in their verbal

attacks of Cahill, and their words conveyed their "rude, insolent, or angry manner." I.C. § 35–42–2–1.

The third consideration is the failure to oppose the crime. Ransom reminds us that she "did oppose the crime," when she "told Reeves 'Stop. That's enough.'" Ransom's Br. at 11 (citing Tr. 62, 94). Again, this statement is not unequivocal evidence of her opposition to the battery, as it could also support the inference that Ransom and Reeves had agreed that Cahill would only be slightly—and not repeatedly—beaten. Further, Ransom was yelling accusations at Cahill before the beating commenced and continued yelling at her during the beating, conduct which supports the inference that she was "induc[ing]" Reeves to commit the battery. I.C. § 35–41–2–4.

The final consideration is Ransom's conduct before, during, and after the battery. *Garland,* 788 N.E.2d at 431. As already discussed, it was Ransom who had the telephone conversation in which accusations against Cahill originally were made; shortly thereafter, Ransom arrived at Cahill's residence with Reeves; Ransom gained entry to the residence for the two; Ransom left with Reeves, not staying to care for Cahill [2]; and Ransom called Cahill the next day to ask whether she was pressing charges.

Sufficient evidence supports the jury's conclusion that Ransom was an accomplice in the battery of Cahill.

b. *Confinement.*

Ransom next challenges the sufficiency of the evidence to support her conviction of

---

**2.** Ransom directs us to Michael's testimony that she told him, "See to [Cahill]," before she left the house that night. (Tr. 200, 201). However, Michael conceded that he had not mentioned this in his statement to the police or in his deposition, explaining that he "didn't think it was relevant." (Tr. 201). Therefore, the jury may have decided not to believe his trial testimony in this regard.

confinement. The offense of confinement is defined as occurring when one "knowingly or intentionally confines another person without the other person's consent," and it is a class B felony "if it is committed while armed with a deadly weapon." I.C. § 35–42–3–3. To "confine" means "to substantially interfere with the liberty of a person." I.C. § 35–42–3–1.

Ransom first argues that the evidence of confinement is insufficient because Cahill "was not confined," in that she neither asked nor tried to leave the dining room, "was never told she could not leave the house or the room," and "was never ordered to go anywhere or to stay anywhere." Ransom's Br. at 14. She cites no precedent in support of her rhetorical argument. Thus, we conclude that she implicitly asks that we reweigh the evidence, which we do not do. *See Dunlap*, 761 N.E.2d at 839.

Cahill testified that Reeves had walked toward her and "got closer," until she was "up against a door." (Tr. 61, 166). The door was to the outside, was closed, and "likely locked." (Tr. 63). Cahill testified that when she was at the door, Reeves had the gun, and she did not feel free to leave. This evidence is sufficient to allow the trier of fact to draw the reasonable inference that Reeves substantially interfered with Cahill's liberty, *i.e.*, that Cahill was confined.

Next, Ransom argues that the evidence was not sufficient to prove that she was "an accomplice to confinement." Ransom's Br. at 15. Towards that end, she simply "incorporates" her argument asserting a lack of accomplice liability on the battery charge. *Id.* Based upon the reasoning above, we find this argument again to fail. The jury heard evidence of Ransom's presence during the confinement of Cahill, her companionship with Reeves during the confinement of Cahill, her failure to oppose the confinement, and her conduct before, during and after the confinement, and that evidence allowed it to draw the inference that Ransom was liable as an accomplice in the criminal confinement of Cahill.

## 2. *Motion for New Trial*

Due process requires the State to disclose to the defense any evidence which is material to the guilt or innocence of the defendant. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to prevail on a *Brady* claim, the defendant

> must establish: (1) that the evidence at issue is favorable to the accused, because it is either exculpatory or impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the evidence was material to an issue at trial.

*Prewitt v. State,* 819 N.E.2d 393, 401 (Ind. Ct.App.2004), trans. denied. Further, in establishing a Brady violation, evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*

Ransom first argues that the evidence of an active warrant for Cahill's arrest was favorable to her because Cahill "was a reluctant witness," had a long and "complex" relationship with Ransom and her family, and her "credibility was crucial." Ransom's Br. at 18. Accepting those assertions, we nevertheless must defer to the trial court's observation of Cahill's demeanor as a witness at trial:

> ... Cahill was a reluctant witness for the State. She was impeached by the State on several occasions, and *sought to minimize Ransom's role in the confrontation*. She yawned during her testimo-

ny, and expressed that she was not particularly excited about testifying against her best friend.

(App. 186) (emphasis added). The trial court concluded that a "fair review of Cahill's testimony does not support th[e] conclusion that she testified particularly favorably for the State, especially with respect to Defendant Ransom." (App. 186).

Thus, the trial court found Cahill's own demeanor to convey her intent that Ransom not be held legally accountable for the incident of December 14, 2003. Further, Cahill expressly testified that she did not "want to see [Ransom] get in trouble." (Tr. 176). Moreover, there is no evidence that Cahill's testimony was a result of her belief that it would gain her favor from the State with respect to the conversion charge. Therefore, we fail to find that evidence of a warrant for Cahill's arrest was evidence favorable to Ransom's defense.

■ To establish a *Brady* violation, the evidence also must have been "suppressed by the State." *Prewitt*, 819 N.E.2d at 401. The State concedes that knowledge of the warrant is necessarily imputed to it, and that it had a duty to disclose the information before trial. However, a *Brady* violation claim will fail where the defendant failed to exercise due diligence to discover the evidence. *See Shanabarger v. State*, 798 N.E.2d 210, 218 (Ind.Ct.App.2003), *trans. denied.* As the trial court noted, "issuance of the warrant is in fact part of the public case chronology for Cahill's pending criminal conversion case." (App. 190).

■ Finally, even if Ransom had established the above two criteria, she still had to establish the reasonable probability that had the arrest warrant been disclosed to the defense, the result of the proceeding would have been different. Ransom ar-

gues that prejudice is shown because the warrant would have been "evidence that [Cahill] was testifying in a way so as to keep herself out of jail." Ransom's Br. at 20. However, as already noted, there is no evidence that Cahill's testimony was a result of her belief that it would gain her favor from the State with respect to the conversion charge.

Further, the record establishes that Cahill's credibility was very much in issue at trial; in fact, she was impeached *by the State* on more than one occasion. The evidence included photographs of Cahill's injuries, and Michael's testimony about the accusations Ransom and Reeves leveled at Cahill as she lay on the floor injured and that Reeves had a gun. Based on this corroborating evidence, we do not find a reasonable probability that had the State disclosed to the defense that an arrest warrant had been issued for Cahill—subsequent to her interviews by and recorded statement to the police about that night in December—the result of the trial probably would have been different. *See Prewitt*, 819 N.E.2d at 401. Therefore, we conclude that the trial court did not err in denying Ransom's motion for a new trial.

### 3. Double Jeopardy

■ In *Richardson v. State*, 717 N.E.2d 32, 49 (Ind.1999), our Supreme Court held that convictions of two or more offenses violate Article 1, Section 14 of the Indiana Constitution "if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." We review *de novo* whether a defendant's convictions violate Indiana's Double Jeopardy Clause. *Spears v. State*, 735 N.E.2d 1161, 1166 (Ind.2000).

■ Ransom argues that her convictions for both battery as a class B felony and confinement as a class C felony violate the Indiana Constitution's prohibition against double jeopardy. Specifically, she claims a violation under the "actual evidence test" and refers us to *Bruce v. State*, 749 N.E.2d 587, 590 (Ind.Ct.App.2001), *trans. denied*

In *Bruce*, the defendant claimed that his convictions "of both attempted aggravated battery and criminal confinement with a deadly weapon" constituted a violation of the "actual evidence" portion of Indiana's Double Jeopardy Clause. 749 N.E.2d at 590. We stated that where "multiple offenses [are] committed as part of a protracted criminal episode," multiple convictions can stand when the record establishes that "the jury could not have reasonably used the same evidence to convict" the defendant of those multiple crimes. *Id.* We then reviewed the final instructions, which we found to "portray the shooting and confinement as two separate incidents." *Id.* We reviewed the prosecutor's closing argument and found it to separately discuss facts with respect to the confinement and other facts with respect to the shooting. *Id.* at 591. We further noted that defense counsel "emphasized the separateness of the confinement and attempted aggravated battery counts" by conceding "that his client had committed confinement with a deadly weapon and battery" but arguing the lack of the necessary *mens rea* for conviction of a charge for shooting at the victim. Based on this record, we concluded that the jury "could not have reasonably used the same evidence to convict Bruce of both attempted aggravated battery and confinement" and, therefore, affirmed. 749 N.E.2d at 590.

Here, the jury was instructed that to convict Ransom of confinement, as a class B felony, the State must have proven beyond a reasonable doubt that she "did knowingly confine Katie Cahill without the consent of Katie Cahill while armed with a deadly weapon, that is: a handgun." (App. 139). The jury was instructed that to convict Ransom of battery, as a class C felony, the State must have proven beyond a reasonable doubt that Ransom "did knowingly, in a rude, insolent, or angry manner, touch Katie Cahill, that is: hit at and against the head and body of Katie Cahill, resulting in bodily injury to Katie Cahill, or by means of a deadly weapon, that is: a handgun." (App. 141). The confinement instruction does not mention any requirement that the State prove a rude, insolent, or angry touching that resulted in bodily injury was inflicted by a handgun. Similarly, the battery instruction does not mention any required proof of having confined Cahill without her consent. Thus, the instructions could portray separate incidents.

However, the prosecutor's closing argument did not clearly separate the evidentiary facts that the State was alleging to constitute separate offenses. Discussing the confinement charge, the prosecutor reminded the jury of the definition of "confining" and asked the jury to consider whether Cahill was ... confined when she was pinned against that wall and ... Reeves was yelling at her, ... Ransom was yelling at her, and ... Reeves was wailing away at her with that handgun." (Tr. 379). With respect to battery, the prosecutor argued that the evidence established that Cahill was "hit at and against the head and body" by a handgun, that "the gun was pointed at her" and "held to her temple" and "put in her mouth," and that the fact Cahill "could not have run away" was evidence that what Reeves struck her with was a gun. (Tr. 381, 382, 383). In the final closing argument, the prosecutor again argued that it was a re-

striction on Cahill's liberty "when she had a gun in her mouth." (Tr. 417).

As to defense closing arguments, we do not find them helpful. Ransom's counsel argued that Ransom had simply opened the door to her father's house with her key, yelled at Cahill, happened to be Reeves' girlfriend, and had told Reeves to stop; thus, there was simply evidence of her presence but not her knowing or intentional participation "in some conduct of an affirmative nature." (Tr. 404).[3]

Finally, we observe that *Bruce* involved a "protracted criminal episode," apparently over a number of hours. 749 N.E.2d at 590. Here, estimates varied as to the duration of the incident giving rise to the charges occurred; however, it was probably not much more than three minutes.

The evidence established that almost immediately upon entering the house, Reeves walked toward Cahill and backed Cahill against a wall; that Reeves struck Cahill repeatedly with the handgun; that at some point he touched it to her face and placed it in her mouth; and that she ended up on the floor attempting to protect her head. After Cahill observed Reeves with the handgun, the sequence of ensuing events is unclear. Also, the events occurred within a relatively short period of time. Further, the State did not clearly explain to the jury that certain evidentiary facts were alleged to constitute the confinement of Cahill, and that separate evidentiary facts allegedly constituted the battery of Cahill. We agree with Ransom that there is a reasonable possibility that the jury found Ransom guilty of confinement, as a class B

felony, for Cahill's having been confined against her will when Reeves was striking her with the handgun, and that the jury also relied on that same evidence—including the use of the handgun—to find her guilty of battery as a class C felony. Therefore, we find that Ransom's convictions of confinement as a class B felony and battery as a class C felony violate Indiana's Double Jeopardy Clause. Accordingly, we vacate Ransom's conviction of battery as a class C felony and remand for entry of conviction of battery as a class A misdemeanor and issuance of a new abstract of judgment. *See Spears*, 735 N.E.2d at 1166 (remedy for double jeopardy violations to reduce or vacate one of the convictions).

Affirmed in part, reversed in part, and remanded.

KIRSCH, C.J., concurs in part and dissents in part with separate opinion.

SULLIVAN, J., concurs in part and dissents in part with separate opinion.

KIRSCH, Chief Judge, concurring in part and dissenting in part.

I fully concur in the decision of my colleagues regarding the sufficiency and *Brady* issues, but I respectfully dissent on the double jeopardy issue.

I think that the evidence here was clear that Ransom committed battery and confinement, that they were discrete crimes, that the trial court properly instructed the jury regarding the two discrete crimes, and that there was no reasonable possibility that the jury used the facts constituting the battery to convict Ransom of the con-

---

**3.** Ransom and Reeves were tried together, and the closing argument by Reeves' counsel appears to concede that Cahill "was hit," but that it had not been proven she was hit by a loaded handgun; Reeves' counsel further argued that "just because you're in a fight with somebody doesn't mean you confined them as well," and the evidence did not establish that

Cahill stayed in the dining room against her will or was held there by a loaded handgun. (Tr. 389). We do not believe that the fact that Reeves' counsel *may* have conceded a battery by his client should bear on the question of whether the State violated Ransom's double jeopardy rights.

finement. Here, the confinement was complete when Ransom and Reeves entered the victim's home, pointed the handgun at the victim and thereby restricted her freedom. Had they left the victim's home at this point, the evidence would have been sufficient to support Ransom's conviction for confinement. They did not leave, however. Rather, they then proceeded to commit the crime of battery when they repeatedly struck the victim with the gun. The fact that the victim was also confined during, and as a result of, the battery does not vitiate the fact that the crime of confinement had already occurred, complete in itself and separate from the subsequent battery.

I would affirm the decision of the trial court in all respects.

SULLIVAN, Judge, concurring in part and dissenting in part.

I fully concur with respect to the lead opinion's holding as to denial of Ransom's Motion for New Trial based upon an alleged *Brady* violation.

As to the sufficiency of the evidence and double jeopardy issues, I write separately in order to cast the evidence and the procedural history of the case in a posture different from that stated in the lead opinion.

I would first opine that Ransom was not convicted of battery as a Class C felony. Rather she was convicted of battery as a Class A misdemeanor. My conclusion in this respect is drawn from the trial court's statement:

> "On the battery, I don't think that under *Richardson* or the other double jeopardy cases, the handgun can be used two times. I think the battery's got to be a misdemeanor so I'll enter judgment on Count III as a, show it as guilty lesser, A misdemeanor." Tr. at 529.[4]

This pronouncement constituted a judgment of conviction upon the battery

---

**4.** The court misspoke in referring to the battery charge as Count III. Original Count I for carrying a handgun by a serious violent felon related only to Reeves. The remaining counts were renumbered so that Count I as finally submitted to the jury was for the Class B confinement. The Class C felony battery became Count II, and pointing a firearm became Count III. The court directed a verdict on new Count IV which was for the charge of carrying a handgun without a license, a Class A misdemeanor. However, during sentencing, the court misspoke to the effect that she had directed a verdict as to the pointing a firearm charge rather than the carrying a handgun charge under new Count IV. Old Count IV was for the pointing offense.

The trial court, as noted, expressed double jeopardy concerns about using the handgun as a predicate for more than one conviction. Be that as it may, the actual conviction judgments were for confinement as a Class B felony, battery as a Class A Misdemeanor, and perhaps for pointing a firearm as a Class D felony. The court sentenced Ransom to 365 days for the battery. Thus, reducing the battery to a Class A misdemeanor eliminates the firearm from the equation as to the battery and thereby eliminating any *Richardson* double jeopardy concerns as to inclusion of the use of a firearm as to both the confinement and the battery convictions.

Ransom does not challenge the pointing conviction perhaps because the court at a subsequent continuation of the sentencing stated that the "pointing should merge with the confinement charge." Tr. at 537. Nevertheless, the parties both presume that the trial court sentenced Ransom to six years upon the confinement conviction and two years (rather than 365 days) on the battery conviction. In doing so, the court said that the minimum sentence was two years. This could only refer to the battery conviction as a Class C felony rather than as a Class A misdemeanor. The court did not discern any unfavorable penal impact upon Ransom, however, because she noted that, "I'm running it concurrent anyway." Tr. at 537.

The fact that Reeves and Ransom were jointly tried may explain why the trial court intermixed the handgun charges as they related to the two defendants. Furthermore, the fact that the sentencing stage was fragmented

charge. As held in *Stott v. State*, 822 N.E.2d 176, 178 (Ind.Ct.App.2005), *trans. denied:*

"We are persuaded by the logic of *Whatley v. State*, 685 N.E.2d 48, 50 (Ind. 1997), which held that the in-court pronouncement prevails over subsequent contradictory language. Here, the trial court obviously and unmistakably stated on the record that Stott was acquitted on Count One. It is elementary that the trial court be bound by its judgment."

Eliminating the use of the handgun as a necessary element of both the confinement and the battery does not end the double jeopardy inquiry. In this respect, my two colleagues approach the issue from different perspectives. Judge Darden's lead opinion concludes that the confinement and battery convictions violate double jeopardy considerations because the jury might have found that Cahill had been confined "when Reeves was striking her with the handgun, and that the jury also relied on that same evidence—including the use of the handgun—to find her guilty of battery as a Class C felony." Op. at 501. This conclusion presupposes that the conviction was truly for a Class C felony, rather than as I submit for a Class A misdemeanor.

In any event, the lead opinion would hold that there was indeed sufficient evidence for the jury to properly find that there was a confinement in that Reeves "backed Cahill against a wall" and that there was a battery in that Reeves "struck Cahill repeatedly with the handgun." Op. at 501. Judge Darden's opinion, however, finds a double jeopardy violation under the same evidence test of *Richardson.*

On the other hand, Judge Kirsch's dissent would hold that the confinement and the battery were discrete crimes, that the jury was properly instructed in this regard, and that there was no same evidence double jeopardy violation.

My conclusions as to the double jeopardy issue proceed from an entirely different analysis of the evidence and approach from an entirely different direction. It is my conclusion that there was no confinement separate and apart from the battery, and for that reason I concur with Judge Darden's opinion to the effect that there was a same evidence double jeopardy violation but must respectfully dissent from affirmance of the battery conviction if reduced to a Class A misdemeanor. Whether as a Class C felony or a Class A misdemeanor, the battery conviction must fail.

The evidence reflects that Cahill and Reeves were walking toward each other before the beating began. Cahill was walking from the kitchen *toward* the living room and Reeves was in the dining room ten to twelve feet away, walking toward her pointing the gun. Given these facts, there was no confinement until Reeves held the gun to Cahill's lips and started beating her. There was no actual confinement when Reeves was ten to twelve feet away and not even as Reeves walked toward her because Cahill was also walking toward Reeves. Cahill testified that Ransom and Reeves were yelling at her during this occurrence. In response to the next question, "What did Michael Reeves do next?" she said, "He just started hitting me with the gun." Tr. at 60.[5]

---

might also account for the apparent discrepancy in the mind of the court as to what the precise offenses were the subject of the convictions and therefore, what the precise convictions were the subject of the sentences imposed.

**5.** With regard to the "same evidence" analysis, I certainly cannot dispute that Judge Darden's lead opinion at page 499 accurately

quotes *Richardson v. State*, 717 N.E.2d 32, 49 (Ind.1999), that a double jeopardy violation occurs if with respect to "the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." Subsequent to the *Richardson* opinion, however, this court held that a double jeopardy violation occurs "where the evidentiary facts

It would appear that when Reeves approached Cahill and began to hit her, she was "right in front of the door" in the dining room. Tr. at 61. She testified that she was not "pinned against the door" but was "just up against it." Tr. at 166. The evidence does not reflect that she backed up to get in front of the door. It merely shows that that was her location when the beating, *and therefore* the confinement, took place.

In short, the confinement did not occur until the battery occurred. This poses the "same evidence" problem for double jeopardy purposes.

I would affirm the conviction and sentence for confinement, it being the conviction with greater penal consequences, but would reverse the conviction for battery, notwithstanding whether it is for a Class C felony or a Class A misdemeanor.

establish[ ] an essential element of one offense also establish[ ] *all* of the essential elements of the second challenged offense." *Alexander v. State*, 768 N.E.2d 971, 974 (Ind.Ct.App.2002). Our Supreme Court denied transfer. It is my view that the present state of the law with respect to the same evidence test is that a double jeopardy violation does not occur only when the evidence establishes *all* of the essential elements of each offense under scrutiny. As set forth in our opinion upon rehearing in *Alexander*, 772 N.E.2d 476, 478 (Ind.Ct.App. 2002):

"Both of the offenses being analyzed for double jeopardy purposes must be viewed in the context of the other offense. If the evidentiary facts establishing any one or more elements of one of the challenged offenses establishes the essential elements of the second challenged offense, double jeopardy considerations prohibit multiple convictions."

This, I believe, is the message conveyed by Justice Sullivan's separate concurrence in *Richardson* wherein he stated that double jeopardy considerations prohibit *"Conviction*

*and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished."* 717 N.E.2d at 55 (original italics) (emphasis supplied).

The five categories under which Justice Sullivan would find a double jeopardy violation have been recognized and applied by subsequent Supreme Court decisions even though those decisions may also refer back to the same evidence test as originally stated in *Richardson. See Guyton v. State*, 771 N.E.2d 1141 (Ind.2002); *Miller v. State*, 790 N.E.2d 437 (Ind.2003). By utilizing Justice Sullivan's same evidence double jeopardy analysis instead of merely relying upon the *Richardson* decision itself, it may be perceived that our Supreme Court has retreated from, if not abandoned, *Richardson*. Indeed, Justice Boehm's separate opinion in *Guyton* says precisely this: "I believe today we have in effect abandoned *Richardson,* and should be explicit in doing this so future trial and appellate courts can follow a consistent methodology in reviewing double jeopardy claims." 771 N.E.2d at 1149.